IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN FLYNN, JAMES BOLAND, GERALD O'MALLEY, KEN LAMBERT, GERARD SCARANO, H. J. BRAMLETT, EUGENE GEORGE, ROBERT HOOVER, MATTHEW AQUILINE, GREGORY R. HESS, MICHAEL SCHMERBECK, VINCENT DELAZZERO, BENJAMIN CAPP, and WILLIAM MCCONNELL<br>as Trustees of, and on behalf of, the<br>BRICKLAYERS & TROWEL TRADES INTERNATIONAL PENSION FUND<br>    620 F Street, N.W.<br>    Washington, DC 20004<br>    (202) 783-3788,<br><br>    and<br><br>JIM ALLEN, MATTHEW AQUILINE, LON BEST, JAMES BOLAND, TED CHAMP, RAYMOND CHAPMAN, VINCENT DELAZZERO, BRUCE DEXTER, JOHN FLYNN, EUGENE GEORGE, GREGORY HESS, FRED KINATEDER, DAN KWIATKOWSKI, KEN LAMBERT, SANTO LANZAFAME, DICK LAUBER, WILLIAM MCCONNELL, EDWARD NAVARRO, GERALD O'MALLEY, JOHN PHILLIPS, CHARLES RASO, MARK ROSE, KEVIN RYAN, GERARD SCARANO, MICHAEL SCHMERBECK, PAUL SONGER, JOSEPH SPERANZA, and FRED VAUTOUR<br>as Trustees of, and on behalf of, the<br>INTERNATIONAL MASONRY INSTITUTE<br>    620 F Street, N.W.<br>    Washington, DC 20004<br>    (202) 783-3788,<br><br>                Plaintiffs,<br><br>                v.<br><br>JOSEPH COHN AND SON, INC.<br>    c/o Joel Cohn, Agent for Service of Process<br>    15 Knollwood Drive<br>    New Haven, CT 06515,<br><br>                Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No:<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

2406091

## COMPLAINT

Plaintiffs, by their attorneys, DICKSTEIN SHAPIRO LLP, complaining of the

Defendant, allege as follows:

### CAUSE OF ACTION

### Jurisdiction and Venue

1.    This is an action brought by the fiduciaries of the Bricklayers & Trowel Trades

International Pension Fund ("IPF" or "Fund") and the fiduciaries of the International Masonry

Institute ("IMI") to enforce the terms of the Plan and Trust Agreements adopted by the IPF and

IMI, and the provisions of the Employee Retirement Income Security Act of 1974, as amended

("ERISA").    This action arises under the laws of the United States, specifically Section

502(a)(3), 502(g)(2), and 515 of ERISA, 29 U.S.C. §§ 1132(a)(3), 1132(g)(2), 1145.  Pursuant to

Section 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1), jurisdiction is therefore conferred on this

Court as to the claims brought on behalf of the IPF and IMI.

2.    The IPF and IMI are administered in the District of Columbia.   Venue for the

claims asserted by the IPF and IMI is conferred on this Court pursuant to Section 502(e)(2) of

ERISA, 29 U.S.C. § 1132(e)(2), which provides:

> (2)  Where an action under this subchapter is brought in a district court of
> the United States, it may be brought in the district where the plan is
> administered, where the breach took place, or where a defendant resides or
> may be found, and process may be served in any other district where a
> defendant resides or may be found.

### Parties

3.      Plaintiffs, John Flynn, James Boland, Gerald O'Malley, Ken Lambert, Gerard

Scarano, H. J. Bramlett, Eugene George, Robert Hoover, Matthew Aquiline, Gregory R. Hess,

Michael Schmerbeck, Vincent DeLazzero, Benjamin Capp, and William McConnell, are

Trustees of, and sue on behalf of, the IPF.  The IPF is an "employee benefit plan" within the

2

meaning of Section 3(3) of ERISA, 29 U.S.C. § 1002(3), and is a "multiemployer plan" within the meaning of Section 3(37) of ERISA, 29 U.S.C. § 1002(37). The IPF trustees bring this action on behalf of, and for the benefit of, the beneficiaries of the IPF in their respective capacities as fiduciaries.

4.    The IPF also is authorized to effect collections on behalf of the IMI, pursuant to a written Assignment of Claims and the *Collection Procedures of the Central Collection Unit of the Bricklayers and Allied Craftworkers* ("Collection Procedures").

5.    Plaintiffs, Jim Allen, Matthew Aquiline, Lon Best, James Boland, Ted Champ, Raymond Chapman, Vincent Delazzero, Bruce Dexter, John Flynn, Eugene George, Gregory Hess, Fred Kinateder, Dan Kwiatkowski, Ken Lambert, Santo Lanzafame, Dick Lauber, William McConnell, Edward Navarro, Gerald O'Malley, John Phllips, Charles Raso, Mark Rose, Kevin Ryan, Gerard Scarano, Michael Schmerbeck, Paul Songer, Joseph Speranza and Fred Vautour, are Trustees of, and sue on behalf of the IMI. The IMI is an "employee benefit plan" within the meaning of Section 3(3) of ERISA, 29 U.S.C. § 1002(3), and is a "multiemployer plan" within the meaning of Section 3(37) of ERISA, 29 U.S.C. § 1002(37). The IMI trustees bring this action on behalf of, and for the benefit of, the beneficiaries of the IMI in their respective capacities as fiduciaries.

6.    Defendant, Joseph Cohn and Son, Inc. ("Joseph Cohn" or "Defendant") is, and at all times hereinafter mentioned was, a company maintaining offices and conducting business in the state of Connecticut.

7.    Defendant employs or has employed members of the International Union of Bricklayers and Allied Craftsmen and its affiliated local unions ("Union").

2406091

**Violation Charged**

8.      Joseph Cohn acting through its authorized agents or officers, executed collective bargaining agreements with the Union.  The collective bargaining agreements are annexed hereto as Exhibits A, B and C, and are hereinafter referred to as the "Agreements."

9.      Pursuant to the Agreements, Defendant agreed to make certain payments to the IPF and IMI for covered work performed by employees of Defendant.

10.     Having submitted some contributions, Defendant has demonstrated an awareness of the obligation to make those payments.

11.     An examination of Defendant's books and records ("Audit #1") performed by the independent accounting firm of Buckley, Frame, Boudreau & Co., P.C. covering the time period January 2001 through August 2003 revealed that Defendant failed to properly submit required reports and contributions for work performed during this time period.

12.     A second examination of Defendant's books and records ("Audit #2") performed by the independent accounting firm of Buckley, Frame, Boudreau & Co., P.C. covering the time period January 2004 through November 2006 revealed that Defendant failed to properly submit required reports and contributions for work performed during this time period.

13.     In addition, although Defendant submitted Reports to the IPF for work performed pursuant to the Agreements in various months during the time period July 1998 through September 2001, Defendant failed to fully pay all related fringe benefit contributions due and payable to the Fund for work performed in various months during this time period.

14.     The total of contributions due the IPF and IMI by Defendant for work performed during the months of January 2001 through August 2003 as determined by Audit #1, amounts to $90,907.32.

2406091

15.     Under the terms of the Plan and Trust Agreements adopted by the IPF and IMI, interest in the amount of $32,025.14, and an additional computation of interest in the amount of $32,025.14, calculated at the rate of 15 percent per annum from the Due Date through March 18, 2005, have been assessed on such delinquent contributions determined due by Audit #1.

16.     The total of contributions due the IPF and IMI by Defendant for work performed during the months of January 2001 through August 2003 as determined by Audit #2, amounts to $56,764.45.

17.     Under the terms of the Plan and Trust Agreements adopted by the IPF and IMI, interest in the amount of $25,055.12, and an additional computation of interest in the amount of $25,055.12, calculated at the rate of 15 percent per annum from the Due Date through December 31, 2007, have been assessed on such delinquent contributions determined due by Audit #2.

18.     In addition, Defendant failed to fully pay contributions to the IPF for work performed in various months during the time period July 1998 through September 2001.  As determined by a Recap prepared by the IPF based on reports submitted by Defendant relating to work performed during this time period, Defendant owes the IPF a total of $7,827.68 in contributions for work performed during this time period.

19.     Under the terms of the Plan and Trust Agreements adopted by the IPF and IMI, interest in the amount of $9,817.25, and an additional computation of interest in the amount of $9,817.25, calculated at the rate of 15 percent per annum from the Due Date through February 29, 2008, have been assessed on such delinquent contributions determined due for work performed in various months during the time period July 1998 through September 2001.

2406091

20.    Plaintiffs have brought this action in faithful performance of the fiduciary duties imposed upon them under Section 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1). Plaintiffs have been, and are, incurring additional attorney's fees as a direct result of Defendant's failure to make contributions in accordance with the terms and conditions of the Agreements.

WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

1.  For the total amount of $297,410.94, which is constituted as follows:

a.  For unpaid contributions in the amount of $155,499.45 payable to the IPF and IMI for the time periods specified above, plus any and all additional amounts found to be due and owing through the date of judgment (ERISA Section 502(g)(2)(A); Collection Procedures);

b.  For interest in the amount of $66,897.51 assessed on such unpaid contributions, calculated at 15 percent per annum from the Due Date (ERISA Section 502(g)(2)(B); Collection Procedures);

c.  For an additional computation of interest in the amount of $66,897.51, assessed on such unpaid contributions, calculated at the rate of 15 percent per annum from the Due Date (ERISA Section 502(g)(2)(C)(ii); Collection Procedures);

d.  For the costs of filing this action in the amount of $350.00 (ERISA Section 502(g)(2)(D));

e.  For the costs of conducting the audits in the amount of $7,766.47 (ERISA Section 502(g)(2)(D));

2.  In the amount of Five Thousand Dollars ($5,000.00), and such additional amounts as may be incurred, representing attorney's fees and costs of this action (ERISA Section 502(g)(2)(D)).

2406091

3.  That Defendant be directed to comply with its obligations to submit all required reports and to make all contributions due and owing to the IPF and IMI, and to pay the costs and disbursements of this action.

4.  Such other relief as this Court deems appropriate, including judgment for any contributions and interest thereon that may accrue subsequent to the filing of this Complaint, as well as any resulting statutory damages thereon under ERISA.

Dated: March 2|    , 2008

By: _____

Ira R. Mitzner, DC Bar No. 184564
Charles V. Mehler III, DC Bar No. 475909
 DICKSTEIN SHAPIRO  LLP
 1825 Eye Street, NW
 Washington, DC  20006
 (202) 420-2200

Attorneys for Plaintiffs

7

2406091

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| JOHN FLYNN, et al. | JOSEPH COHN AND SON, INC. |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____11001_____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Ira R. Mitzner (202) 420-2200
Dickstein Shapiro LLP
1825 Eye Street, N.W.
Washington, DC 20006

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

O 1 U.S. Government
Plaintiff

⊙ 3 Federal Question
(U.S. Government Not a Party)

O 2 U.S. Government
Defendant

O 4 Diversity
(Indicate Citizenship of
Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | O 1 | O 1 | Incorporated or Principal Place of Business in This State | O 4 | O 4 |
| Citizen of Another State | O 2 | O 2 | Incorporated and Principal Place of Business in Another State | O 5 | O 5 |
| Citizen or Subject of a Foreign Country | O 3 | O 3 | Foreign Nation | O 6 | O 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

**O A. Antitrust**

☐ 410 Antitrust

**O B. Personal Injury/
Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**O C. Administrative Agency
Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If
Administrative Agency is Involved)

**O D. Temporary Restraining
Order/Preliminary
Injunction**

Any nature of suit from any category may
be selected for this category of case
assignment.

*(If Antitrust, then A governs)*

**O E. General Civil (Other)** OR **O F. Pro Se General Civil**

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or
defendant
☐ 871 IRS-Third Party 26
USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure
of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational
Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC
Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced &
Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/
Exchange
☐ 875 Customer Challenge 12 USC
3410
☐ 900 Appeal of fee determination
under equal access to Justice
☐ 950 Constitutionality of State
Statutes
☐ 890 Other Statutory Actions (if
not administrative agency
review or Privacy Act

| ⊙ **G.** *Habeas Corpus/ 2255* | ⊙ **H.** *Employment Discrimination* | ⊙ **I.** *FOIA/PRIVACY ACT* | ⊙ **J.** *Student Loan* |
|---|---|---|---|
| ☐ **530** Habeas Corpus-General<br>☐ **510** Motion/Vacate Sentence | ☐ **442** Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ **895** Freedom of Information Act<br>☐ **890** Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ **152** Recovery of Defaulted Student Loans (excluding veterans) |

| ⊙ **K.** *Labor/ERISA (non-employment)* | ⊙ **L.** *Other Civil Rights (non-employment)* | ⊙ **M.** *Contract* | ⊙ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ **710** Fair Labor Standards Act<br>☐ **720** Labor/Mgmt. Relations<br>☐ **730** Labor/Mgmt. Reporting & Disclosure Act<br>☐ **740** Labor Railway Act<br>☐ **790** Other Labor Litigation<br>☒ **791** Empl. Ret. Inc. Security Act | ☐ **441** Voting (if not Voting Rights Act)<br>☐ **443** Housing/Accommodations<br>☐ **444** Welfare<br>☐ **440** Other Civil Rights<br>☐ **445** American w/Disabilities-Employment<br>☐ **446** Americans w/Disabilities-Other | ☐ **110** Insurance<br>☐ **120** Marine<br>☐ **130** Miller Act<br>☐ **140** Negotiable Instrument<br>☐ **150** Recovery of Overpayment & Enforcement of Judgment<br>☐ **153** Recovery of Overpayment of Veteran's Benefits<br>☐ **160** Stockholder's Suits<br>☐ **190** Other Contracts<br>☐ **195** Contract Product Liability<br>☐ **196** Franchise | ☐ **441** Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding    ○ 2 Removed from State Court    ○ 3 Remanded from Appellate Court    ○ 4 Reinstated or Reopened    ○ 5 Transferred from another district (specify)    ○ 6 Multi district Litigation    ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

ERISA - Complaint filed for recovery of delinquent contributions - 29 U.S.C. Sections 1002, 1132, 1145

**VII. REQUESTED IN COMPLAINT**    ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    **DEMAND $** _____    Check YES only if demanded in complaint    **JURY DEMAND:**   YES ☐   NO ☒

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐   NO ☒   If yes, please complete related case form.

DATE 3/21/08    SIGNATURE OF ATTORNEY OF RECORD _____

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

Exhibit A



# SPECIAL INTERNATIONAL MASONRY INDUSTRY AGREEMENT

developed by the
**International Union of Bricklayers
and Allied Craftsmen**
in consultation with the
**International Council of Employers
of Bricklayers and Allied Craftsmen**

To improve mobility of manpower, to increase efficiencies and competitiveness, to foster the principles of collective bargaining, to promote closer working relationships between the International Union of Bricklayers and Allied Craftsmen and signatory employers, to eliminate strikes and lockouts, to provide a peaceful means for the settlement of grievances and disputes, to encourage masonry training programs, to promote safe working sites, and to ensure uniform area rates of wages, hours and conditions of employment, we, the International Union of Bricklayers and Allied Craftsmen and individual employers signatory to this Agreement, hereby, do adopt this International Agreement as the basis of our relations. A basic principle of this Agreement is that a fair day's work shall be provided for a fair day's pay.

The International Union of Bricklayers and Allied Craftsmen shall hereinafter be referred to as the "Union," "BAC" or the "International Union." Local Unions, District Councils and Conferences of the International Union of Bricklayers and Allied Craftsmen shall hereinafter be referred to as the "Local Union." The International Council of Employers of Bricklayers and Allied Craftsmen shall hereinafter be referred to as the "Council."

Individual Employers who become signatory to this Agreement and members of contractor associations which become signatory to this Agreement who have designated that association as their bargaining representative shall hereinafter be called the "Employer".

Each Employer on whose behalf this Agreement has been developed and each future Employer who becomes a party by signing the Agreement, shall individually be liable and responsible for its own acts and conduct and for any breach or alleged breach of this Agreement.

## ARTICLE I
### Duration

This Agreement, executed to be effective the /2ᵗʰ day of _____ 19 __, shall remain in effect for three (3) years and shall automatically continue yearly thereafter unless notice of modification or termination is given by certified mail in writing by either party to the other at least sixty (60) days prior to the anniversary date. The parties may at any time mutually agree to change or amend any part of this Agreement and such changes or modifications shall not affect the continuing nature of this Agreement.

In the event notice of termination or modification is given as provided in the above paragraph and an agreement on a new or modified agreement is not reached by the anniversary date, the individual signatory Employers and the Union agree to continue to work under the terms of this Agreement on a day-to-day basis until such time that either a new agreement or an impasse is reached.

## ARTICLE II
### Scope

This Agreement shall be in effect within the boundaries of the United States and Canada and all possessions and territorial dependencies.

A. This Agreement covers all construction work within the jurisdiction of the International Union, as defined in the Constitution of the International Union, as well as all other work normally and traditionally assigned to and performed by employees represented by the International Union of Bricklayers and Allied Craftsmen.

B. The Employer agrees to assign to employees, journeymen, apprentices, and support personnel represented by BAC all work which has been historically or traditionally assigned to members of the International Union of Bricklayers and Allied Craftsmen, including but not limited to: all forms of masonry construction, including all brick, stone, concrete block, marble, plaster, mosaic, tile, terrazzo, terra cotta, glass block, refractory materials, and pointing-cleaning-caulking work; the complete installation of all forms of masonry panels including the off and/or on-site fabrication, all integral elements of masonry construction and all forms of substitute materials or building systems thereto utilized in all forms of construction, maintenance, repair and renovation.

C. In addition, the Employer agrees to assign to employees represented by BAC all other work assignments mutually agreed upon between the Employer and the Union or the Local Unions, and all such work shall be covered by this Agreement.

## ARTICLE III
### Management Recognition and Rights

The Union hereby recognizes and acknowledges that jobsite discipline is the responsibility of the Employer. Except as otherwise provided herein, the Employer shall have the right to hire, fire, suspend or discipline for just cause, direct the working force, and to manage its business in accordance with its best judgment.

In compliance with the International Masonry Institute Trust Agreement, it is understood that all Employers signatory to this Agreement either individually or through their membership in a contractor association shall be eligible to serve on the IMI Board of Trustees.

## ARTICLE IV
### Union Recognition, Union Security, Access

A. *Union Recognition.* The Employer hereby recognizes and acknowledges that the Union is the exclusive representative of all of its employees in the classifications of work falling within the jurisdiction of the Union, as defined in Article II of this Agreement, for the purpose of collective bargaining.

B. *Union Security.* No later than eight (8) days following the effective date of this Agreement, all present employees working under the terms of this Agreement must, as a condition of continued employment, be or become members of the Union; all employees hired after the effective date of this Agreement shall be or become and remain members of the Local Union no later than eight (8) days following the first day of their employment in accordance with the provisions of Section 8 of the National Labor Relations Act, as amended. Failure of any employee to comply with the provisions of this Article shall, upon request of the applicable Local Union, result in the termination of such employee. The Employer shall not be obligated to dismiss an employee for non-membership in the Local Union: (a) if he has reasonable grounds for believing that such membership was not available on the same terms and conditions generally applicable to other members, or (b) if he has reasonable grounds for believing that such membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and initiation fees uniformly required as a condition of acquiring or retaining membership. This clause shall not be effective in those states prohibiting such Union Security, provided, however, that where an Agency Shop is lawful in such State, conformity therewith shall be a condition of employment in accordance with the conditions set forth in Section 8 of the National Labor Relations Act, as amended.

C. *Union Access to Job.* International Union Representatives and the Business Manager and/or other representatives of the Local Union having jurisdiction over the jobsite shall have access to the Employer's jobsites at reasonable times in compliance with any reasonable rules and regulations adopted by the owner to ensure that the provisions of this Agreement are observed, provided, however, that such representatives shall not unduly interfere with the job progress.

2

## ARTICLE V
### Company Field Employees, Local Employment Preference

A. It is understood by the International Union that the Employer desires to maintain a permanent workforce of steady employees, who shall be defined for purposes of this Agreement as "company field employees", including apprentices, hired with the expectation that they shall be employed by the Employer on a continuous basis to the extent that work is available both within the area covered by the Local Union where the Employer maintains an office as well as on projects throughout the United States and Canada.

B. It is agreed that the Employer shall, in addition to those company field employees described in Section A of this Article, give hiring preference when starting a project to local employees, who shall be defined for purposes of this Agreement as employees residing or normally employed in the territorial jurisdiction of the Local Union in which the jobsite is located. Such local employees must be skilled in the type of masonry work to be done by the Employer on the project before they can be referred for employment.

C. The Employer agrees that within thirty (30) days from his execution of this Agreement he will furnish the International Union with a signed statement listing its company field employees by normal craft assignment, specifying their most recent date of hire. The Employer further agrees that after the filing of this initial listing in order for any additional employee in its workforce to be designated as a company field employee such employee must have been steadily employed by the Employer for a minimum of six continuous months. The Employer shall notify, in writing, the International Union of any additions to or deletions from this list within thirty (30) days of such change.

D. Any charges of violation of this Article shall be processed in accordance with the procedure for handling grievances as described in Article XII of this Agreement.

## ARTICLE VI
### Pre-Job Conferences, Hiring, Stewards, Apprentices

The Employer shall notify the Business Manager of the Local Union having jobsite jurisdiction within forty-eight (48) hours of being awarded a contract for a project located within the area covered by the Local Union.

A. The Employer shall contact the Business Manager of the Local Union in the area where the job is located and schedule a pre-job meeting, or, if appropriate, a telephone conference, to be held at least seventy-two (72) hours prior to commencing work to discuss labor requirements for the project. The Employer agrees to hold a pre-job conference with the Local Union Business Manager or other authorized representative in accordance with the aforementioned time period for all projects which will require a workforce of more than ten (10)

employees. If the Employer has difficulty in contacting the representative of the Local Union, the Employer shall send a telegram outlining the labor required for the project to the office of the Local Union at least forty-eight (48) hours prior to beginning any work on the project. Any charges of violation of this Article shall be processed in accordance with the procedure for handling grievances as described in Article XII of this Agreement.

The Parties agree that one important element for successful masonry projects is a good constructive working relationship between the Employer and the local Business Manager. The local Business Manager is recognized as the key individual to be contacted for a meeting with the Employer before a project is started so that all potential labor or scheduling difficulties on a job can be resolved before work begins.

B. Hiring

1. The Employer agrees that a fair percentage of local employees from the craft having jurisdiction over the work to be performed will be hired, if available, when the project is started. In addition, the Union agrees that the Employer shall be permitted to assign a reasonable number of company field employees, including a foreman, to each project. Where there is in effect in any locality a Local Union hiring hall or referral system, the hiring of local employees shall be in accordance with such system. To the extent consistent with such a system, the Employer may request by name, specific individuals who have previously worked for the Employer who will be referred, if available. In areas where there is no hiring hall or referral system in effect, the Employer agrees to give preference to persons residing or normally employed in the geographic area covered by the jobsite Local Union.

2. The parties agree that if the jobsite Local Union is unable within forty-eight hours of a request, excluding weekends and holidays, to refer the skilled employees required for the project, then the Employer is free to secure the additional employees necessary to complete the project. The Union agrees whenever requested, to assist the Employer in securing the craftsmen required to meet the specific project manpower needs. The Employer shall be permitted to assign more company field employees or recruit additional skilled employees from other areas for the project if the jobsite Local Union cannot provide the required number of local employees. The parties further agree that when the project nears completion or encounters interruptions in employment, layoffs shall be in reverse order to hirings with the last employee hired to be the first employee laid off except when special skills are required to finish the project.

3. It is understood that the Employer shall have the right to determine the competency and qualifications of applicants referred by the Local Union. The selection of applicants for referral to jobs shall not be based on, or in any way affected by, union

3

membership, bylaws, rules, regulations, constitutional provisions or any other aspect or obligation of union membership, policies or requirements. Nor shall the selection or hiring of such employees be based on or in any way effected by race, creed, color, sex, age or national origin.

4. The Employer shall hire a steward appointed by the Business Manager of the jobsite Local Union on all jobs. The steward shall be a working employee, shall be hired when masonry work commences, and shall, when appropriate, be granted reasonable time to conduct union business.

C. Apprentices. In order to train sufficient skilled mechanics for the needs of the masonry industry, the necessity for employment of apprentices and/or apprentice improvers is recognized and encouraged by the parties to this Agreement. The Employer agrees to hire an apprentice, if available, from the jobsite Local Union for each apprentice the Employer brings to the jobsite as a company field employee. It is agreed that the Employer shall abide by the National Apprenticeship Standards developed for masonry craft training.

## ARTICLE VII
### Local Agreements

A. Whenever the Employer participates directly in local negotiations, he shall be affected by the events which occur during that process including any economic action and he shall be bound to the terms of any agreement that is consummated from such negotiations, which are not in conflict with the provisions of this Agreement.

B. Whenever the Employer works in an area where he does not participate directly in local negotiations, the following procedure will apply:

1. Prior to the commencement of work in an area where wages, benefit contributions and working conditions have been negotiated through bona fide collective bargaining, the Employer will be presented with such evidence by the Local Union and the Employer will abide by the wages, benefit contributions, and working conditions set forth in such agreement which are not in conflict with this Agreement.

a. Where the local agreement specifies that a portion of the total wage package is to be paid in the form of contributions to a trust or trusts which meet the requirements of Section 302 of the Labor Management Relations Act of 1947, as amended, 29 USC 186, the Employer will be bound by the terms, conditions and provisions of the trust agreements (copies of which will be available to the Employer upon request); and to make the contributions called for by said agreements except as specified in paragraph b below, at the rate and in the manner specified therein; to irrevocably designate as its representatives on the board of trustees of such trusts such trustees as are named in said agreements as employer-trustees, together with their successors selected in the manner provided in said agreements; and to be bound by all actions which are not in conflict with the terms of this

Agreement taken by said trustees pursuant to the said agreements.

b. When the Employer assigns company field employees or, in order to meet project manpower needs, is required to recruit employees who normally reside or work outside the jurisdiction of the jobsite Local Union or any District Council to which the Local Union may be affiliated, the Employer shall pay all contributions to health and welfare and pension plans into the home trust funds designated by such employees at the applicable home trust fund rates. In these same circumstances, the Employer shall pay any annuity contribution and/or vacation deduction called for in the jobsite agreement to the home trust funds designated by such employees, or in the event there is no home annuity and/or vacation fund, to the IPF Retirement Savings Plan and/or the International Vacation Fund.

(i) Wages for company field employees and any recruited employees shall be paid in accordance with the jobsite agreement. If the contributions specified in the previous paragraph to the applicable home trusts for such company field and recruited employees are less than the health and welfare, pension, annuity and/or vacation contributions called for in the job-site agreement then the Employer shall pay the difference to the Bricklayer and Trowel Trades International Retirement Savings Plan. The Employer agrees to be bound by the terms, conditions, and provisions of the IPF Trust Agreement covering the Retirement Savings Plan (copies of which will be available to the Employer upon request), to make the contributions to this Fund in the manner specified, to irrevocably designate as its representative on the board of trustees such trustees as are named in said Agreement as employer trustees, together with their successors selected in the manner provided in such Agreement, and to be bound by all actions taken by said trustees pursuant to the said Agreement which are not in conflict with the terms of this Agreement.

(ii) If the Employer pays a higher taxable wage rate to either company field employees or recruited employees than the wage rate specified in the jobsite agreement then that higher wage rate shall become the applicable wage rate for all covered journeyman employees on that jobsite for the duration of the project.

(iii) Each company field or recruited employee shall file with the Employer a statement on a form prepared by the International Union designating his or her home trust funds. All other contributions called for by the jobsite Local Union agreement are to be paid in accordance with that agreement.

(iv) The Employer agrees to be bound by the terms, conditions, and provisions of such home trust fund agreements (copies of which will be available to the Employer upon request), and to make the contributions called for to said funds at the rate and in the manner specified; to irrevocably designate as its representatives on the board of trustees of such trusts such trustees as are named in said agreements as employer trustees, together with their successors selected in the manner provided in said agreements; and to be bound by all

4

actions which are not in conflict with the terms of this Agreement taken by said trustees pursuant to the said agreements.

(v) The Employer agrees to furnish upon request of either the Union or the jobsite Local Union, verification of the payments of said contributions to home health and welfare, pension, annuity, vacation plans and the IPF Retirement Savings Plan. The Union and applicable trust funds shall have the right to audit the Employer's records to determine that the proper wage rate and fund contributions have been made in accordance with the terms of this Agreement.

c. The Employer agrees to sign, upon the request of the Business Manager of the jobsite Local Union, the standard BAC Assent of Participation covering the area benefit contributions.

d. Nothing contained in the paragraphs above is intended to require the Employer to become signatory to a local collective bargaining agreement, nor is any signatory Employer required to assign his bargaining rights or become a member of any local employer group or local association as a condition for making such contributions.

2. After the Employer's operation has commenced in any such area, no subsequent change in the wages, benefit contributions or working conditions in such area will become effective insofar as the Employer is concerned, except to the extent that any such changes in wages, benefit contributions or working conditions have been agreed upon in negotiations between the Local Union having jurisdiction over the area and a recognized bargaining group of contractors in such area and are not in conflict with the terms of this Agreement. The Employer agrees to accept the new wage rates, benefit contributions and working conditions so agreed upon and pay the applicable rates retroactively to either the effective date so agreed upon, or to the termination date of the previous agreement, if earlier, which was in effect at the commencement of the Employer's operations in such area. Pending execution of such local agreement, there shall be no stoppage of work on the Employer's project by the Local Union or any lockout by the Employer by reason of any dispute over wages, benefit contributions or working conditions which may occur between the Local Union and contractors other than the Employer.

3. Prior to the commencement of work in any area where no wages, benefit contributions and working conditions have been established, the Business Manager of the jobsite Local Union and the Employer will negotiate the wages, benefit contributions and appropriate working conditions which shall be put in written form jointly signed and forwarded to the office of the International Union.

C. It is mutually agreed that whenever the Employer performs work within an area or the jurisdiction of a Local Union where more than one BAC collective bargaining agreement or craft wage and benefit rate is in effect, the Employer and Business Manager or Managers of the Local Union or Unions involved will meet to determine which

local wage and benefit rate, agreement or agreements shall be applicable for that project. In the event that they fail to reach an agreement on that determination, the unresolved questions regarding the proper jurisdiction on the project will be referred to the International Union for determination after consultation with representatives of the Employer and Local Union or Unions.

1. In the interest of efficiency and competitiveness, any incidental craft work assignments required by the Employer to complete a project shall be performed under the terms of the agreement in effect covering the majority of the masonry work on the project.

2. Whenever the Employer assigns local employees to work under such an applicable agreement who normally work under the terms of another BAC craft agreement in that locality, the Employer shall pay the governing agreement's gross rate of pay to such employees less the benefit fund contributions which shall be paid in accordance with the terms of the agreement under which said employees normally work.

D. When the Employer works under a collective bargaining agreement calling for contributions to local industry, promotion or training programs but which does not provide for contributions to the International Masonry Institute, the Employer shall, in lieu of such local contribution or contributions, make a contribution to the International Masonry Institute in an amount equal to the industry, promotion and/or training contributions called for in the local agreement.

### ARTICLE VIII
#### Wages, Benefit Contributions, Working Conditions

A. Wages, benefit contributions, apprentice ratios and working conditions will be paid and implemented as prescribed in the appropriate local agreement as provided in Article VII "Local Agreements" except as may be modified by the provisions of this Article.

B. The Union and the Employer agree that a major objective of this Agreement is to increase the employment opportunities for the membership of the Union and to encourage signatory Employers to bid and negotiate for more masonry projects in order to expand the amount of masonry work being done under the terms of collective bargaining agreements. The Union and the Employer agree to aggressively work together with the greatest degree of cooperation possible to achieve these goals. The Union and the Employer, through cooperative efforts, agree to discourage project delays, loss of wages, and impediments to job site progress which could result in lost employment opportunities.

C. In order to further these principles the Union and Employer agree to the following uniform working conditions.

1. *Shifts.* Shift work may be performed at the option of the Employer, but when performed it

must continue for a perod of not less than five consecutive work days. Saturday and Sunday, if worked, can be used for establishing the five day minimum shift work period. The straight time work week shall be considered to start with the day shift on Monday, unless the applicable local agreement calls for a 12:01 a.m. Monday shift start, and end with the conclusion of the second or third shift on the fifth day. In the event the second or third shift of any regular work day shall extend into a holiday, employees shall be paid at the regular shift rate.

a. The first shift shall be the regular day shift insofar as computing wage payments is concerned, and the first day shift shall work a regular eight hour shift, with a one half-hour unpaid lunch period midway through the shift.

b. If two work shifts are established, the second shift shall consist of seven and one half hours of continuous work, with a one half-hour unpaid lunch period midway through the shift. Employees working on the second shift shall receive eight hours times the basic straight time rate plus $.25 for each of those eight hours.

c. If three work shifts are established, the third shift shall consist of seven hours of continuous work, plus one half-hour unpaid lunch period midway through the shift. Employees working on the third shift shall receive eight hours times the basic straight time rate plus $.50 for each of those eight hours.

d. Time worked in excess of seven and one half-hours on the second shift and seven hours on the third shift shall be paid at the appropriate overtime rate.

e. In computing overtime pay on shift work, the overtime rate of pay shall be based upon the wage rate established for the shift involved less the shift differentials.

2. *Pay Day.* Pay day shall be in accordance with the provisions of the jobsite local agreement. If the local agreement does not establish such rules then pay day shall be once each week no later than the fifth working day following the end of the Employer's weekly payroll period. Employees are to be paid at the option of the Employer in cash or negotiable payroll check, provided that the Employer makes arrangements for cashing such checks with a designated local bank. Employees shall be given their pay at their workstation at least one hour before quitting time. When employees are laid off or discharged, they shall be immediately paid all wages due.

3. *Holidays.* Holidays are to be observed in accordance with the schedule adopted by the jobsite local union or building trades council. If no such rules have been established then the holidays in the United States will be New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving and Christmas while in Canada, the holidays will be New Year's Day, Good Friday, Victoria Day (or Birthday of the Reigning Sovereign), Canada Day, Civic Holiday, Labour Day, Thanksgiving Day, Christmas Day and Boxing Day.

4. *Travel and Subsistence.* Normally a Local Union will provide the necessary workforce for all projects throughout its territory and no travel pay will be paid. In certain geographic areas involving long distances between project jobsites and employee residences, travel pay will be established before the work commences by the Employer and Local Union on a "per-job" basis. Employees referred to jobs shall report to a location designated by the Employer. When requested to stay away from home overnight, the employee shall be reimbursed for meals and lodging at reasonable rates to be established before the work commences by the Employer and Local Union on a "per-job" basis.

D. In order to provide further flexibility when required, the parties to the Agreement agree:

1. To cooperate in meeting conditions peculiar to a job or project on which the Employer may be bidding, negotiating, or have under contract. They will at all times meet and confer respecting any questions or misunderstanding that may arise under the performance of this Agreement.

2. That whenever the Employer is bidding or negotiating for a masonry project where competing work forces are determined to be the likely contractor for the project, the Union will meet with the Employer to consider, after consultation with the job site Local Union, special conditions for that project which may be necessary to secure the work opportunities on that project for signatory Employers and employees represented by the Union.

3. That the Union will consider, after consultation with the job site Local Union, special conditions of employment and rates of wages and contributions on projects which require the Employer to cover and heat all or major portions of a masonry project in order to provide full-time continuous employment for employees represented by the Union.

4. That the special conditions the Union will consider approving, after consultation with the job site Local Union, for a specific project or for an area in order to provide efficient and effective alternatives to non-union competition will include make up day on Saturday for time lost because of inclement weather, time and a half for overtime Monday through Saturday, eight hour work days and a ten hour four day work week schedule.

5. That any special conditions of employment or wage and contribution rates granted under the provisions of this Agreement for a specific project or geographic area will be available to any and all other Employers signatory to this Special International Masonry Industry Agreement for that project or geographic area upon their request.

E. President's Committee.

1. To facilitate the implementation of special conditions of employment mentioned in the paragraphs above the parties agree that there shall be established a "President's Committee" consisting of the President of the Union, the President of the Council and the Impartial Umpire provided for in

6

the International Masonry Institute Dispute Settlement Plan. The President of the Union and the President of the Council may appoint alternates to themselves to serve on this Committee. The President's Committee will determine when and how special conditions of employment are to be considered and implemented. The President's Committee may upon written request, review and when determined necessary, suspend a provision or provisions of this agreement relating to starting times or work schedules when such provisions are found to be inconsistent with the schedule required by an owner or general contractor that has been agreed to by other building trades crafts working on the project. Decisions of the President's Committee pertaining to special conditions shall be final and binding upon all parties to this Agreement.

2. The President's Committee shall also be charged with promoting an understanding of the needs of the Union and the Employers in the implementation of this Agreement, and to respond to any questions raised regarding the meaning and intent of this Agreement. All decisions of the President's Committee, which address or clarify the meaning and intent of this Agreement, shall be immediately distributed to signatory Employers by the Council and to Local Unions by the Union, with the understanding that any actions required by such decision will be promptly implemented. Except as provided in Article VIII, Section E, Paragraph 1, decisions of the President's Committee can only be made to resolve questions or disputes regarding the meaning or intent of specific provisions of this Agreement and cannot be made to add to, omit from or alter the provisions of this Agreement.

### ARTICLE IX
### International Masonry Institute
### Disputes Settlement Plan

The Union, the Council and the signatory Employers agree to recognize, be bound by and support the International Masonry Institute's Disputes Settlement Plan.

The Plan continues a relationship between labor and management in the masonry industry establishing procedures to improve collective bargaining between the parties in various labor agreements in the industry, to provide joint procedures for the mediation and conciliation of disputes in the negotiations of collective bargaining agreements, and to provide for final resolution of disputes over terms of collectively bargained agreements. Executed copies of the Plan are available upon request to parties signatory to this Agreement.

### ARTICLE X
### Bonding

Prior to commencing any work covered by this Agreement, the Employer shall obtain a bond in the amount of $25,000, (twenty-five thousand dollars) or such greater amount as required by applicable local collective bargaining agreements, with a duly qualified bonding company in a form approved by the International Union, to secure payment of wages, benefit contributions, and other sums due under this Agreement.

### ARTICLE XI
### Dues Check-Off

The Employer shall deduct from the wages of each employee who has signed a check-off authorization form conforming to federal law, and transmit monthly to the applicable Local Union (or to any agency designated by said Local Union for the collection of said money), the sum for each hour paid which the Local Union has specified, or specifies from time to time and so advises the Employer in writing, as the portion of said employee's union dues to said Local Union, to the International Union, or to any other affiliate of the International Union, subject to check-off. The sums transmitted shall be accompanied by a statement, in a form specified by the Local Union, reporting the name of each person whose dues are being paid and the number of hours each employee has been paid.

### ARTICLE XII
### Grievance Procedure

A. It is specifically agreed that any controversy arising during the effective period of this Agreement involving the application or interpretation of any of its terms and conditions, other than a jurisdictional dispute over the assignment of work, shall be settled in accordance with the grievance procedure set forth in this Article. No grievance shall be recognized unless it is called to the attention of the Employer by the Union or Local Union or to the attention of the Union or Local Union by the Employer within five working days after the alleged violation is committed or should reasonably have been discovered.

B. A grievance shall be resolved in accordance with the following procedures:

*Step 1.* The grievance shall be referred to the jobsite Local Union steward and to the Employer's representative at the jobsite for settlement.

*Step 2.* If the grievance cannot be settled within twenty-four hours pursuant to Step 1 of this procedure, the grievance shall be referred on the following working day to the applicable Local Union Business Manager and to the Employer's representative.

*Step 3.* If the grievance cannot be settled pursuant to Step 2 of this procedure within three working days, excluding weekends and holidays, the grievance shall be submitted within two working days to the International Union which shall attempt to resolve the matter with the Employer.

*Step 4.* If the matter is not resolved by the International Union and the Employer, the dispute will be submitted to the International Masonry Institute's Dispute Settlement Plan for resolution under the Plan's operating procedures referred to in Article IX of this Agreement. The decision reached

in accordance with the Plan's procedures shall be binding upon all parties.

C. The time limits specified in any step of the Grievance Procedure may be extended by mutual agreement of the parties, initiated by a written request of one party to the other, at the appropriate step of the Grievance Procedure. Failure to file or process a grievance within the time limits provided shall be deemed a waiver of such grievance without prejudice, but shall create no precedent in the processing of and/or resolution of like or similar grievances or disputes.

D. In order to encourage the resolution of disputes and grievances at Steps 1 and 2 of Section B of this Grievance Procedure, the parties agree that such settlement shall not be precedent-setting.

E. When a settlement has been reached at any step of this Grievance Procedure, such a settlement shall be final and binding on all parties.

F. It is expressly understood by the parties hereto that the procedure for adjustment of grievances set out in this Article is exclusive and supersedes any other plan, method or procedure.

## ARTICLE XIII
### Subcontracting

A. All subletting, assigning or transferring by the Employer of any work in connection with employment covered by this Agreement must be subcontracted, assigned or transferred to a person, firm or corporation which recognizes the Bricklayers and Allied Craftsmen or one of its Local Unions as the collective bargaining representative of its employees and agrees that all such work shall be done under the terms of this Agreement. A violation of this provision will be deemed a breach of this Agreement.

B. All charges of violations of this Article shall be considered as a dispute, and shall be processed in accordance with the provisions of Article XII of this Agreement covering the procedure for handling of grievances, and the final and binding resolution of disputes.

## ARTICLE XIV
### Preservation of Work

In order to protect and preserve, for the employees covered by this Agreement, all work heretofore performed by them, to protect the benefits to which employees are entitled under this Agreement, and to prevent any device or subterfuge to avoid the protection and preservation of such work and benefits, it is hereby agreed as follows: If and when the Employer shall perform any work of the type covered by this Agreement at any construction site (i) under its own name, or (ii) under the name of another entity (whether a corporation, company, partnership, or any other business entity, including a joint venture) wherein the Employer, including its owners and stockholders (other than a corporation that is primarily engaged in industrial production), officers, directors, or partners exer-

cises either directly or indirectly (such as through family members) any significant degree of ownership, management or control, the terms and conditions of this Agreement shall be applicable to all such work.

A. A charge of violation of this Article may be filed by the Union and/or the trustees of any of the joint trust funds provided for in this Agreement, and shall be considered as a dispute under this Agreement and shall be processed in accordance with the procedures for the handling of grievances and the final binding resolution of disputes as provided in Article XII of this Agreement. As a remedy for violations of this Article, the Umpire provided for in Article XII is empowered, at the request of the Union and/or the trustees of the joint trust funds, to require an Employer to (a) pay to affected employees covered by this Agreement, including registered applicants for employment, the equivalent of wages lost by such employees as a result of the violations, and (b) pay into the affected contributory funds established under this Agreement or any applicable local agreement, any delinquent contributions to such funds which have resulted from the violations. Provision for this remedy herein does not make such remedy the exclusive remedy available to the Union for violation of the Article, nor does it make the same or other remedies unavailable to the Union for violation of other sections or other articles of this Agreement. However, the Union expressly agrees that it will not engage in strikes, picketing or other economic actions to enforce the provisions of this Article.

B. If, as a result of violations of this Article, it is necessary for the Union and/or the trustees of the joint trust funds to institute court action to enforce an award rendered in accordance with Section A above, or to defend an action which seeks to vacate such award, the Employer shall pay any accountants' and attorneys' fees incurred by the Union and/or fund trustees, plus costs of the litigation, which have resulted from the bringing of such court action.

## ARTICLE XV
### No Strike, No Lockout

A. It is understood and mutually agreed that there shall be no strikes or lockouts over a dispute concerning this Agreement during its term until the grievance procedures described in Article XII have been exhausted and then only in the event a party fails or refuses to abide by a final decision. This Article shall not apply in those cases where the Employer fails or refuses to make in whole or in part any payments required under this Agreement including all wages, local union fringe benefits or other contributions that have been established through bona fide collective bargaining.

B. There shall be no stoppage of work on the Employer's project by the Union, or any lockout by the Employer by reason of any dispute which may occur between a Local Union and a contractor or

area contractors other than the Employer, provided that refusal by any employee to pass through a lawfully permitted picket line will not constitute a violation of this Agreement.

## ARTICLE XVI
### Savings Clause

If any provision of this Agreement shall violate any applicable statute or is held invalid by any court or governmental agency having jurisdiction, then such provision shall be void in the jurisdiction of such court or agency and the Employer and the International Union agree that upon a ruling of invalidity they will renegotiate immediately to replace the voided provision with one that incorporates the substance of the voided provision to the extent allowable under the law; such ruling of invalidity shall not affect the validity of the remainder of this Agreement. Where a money item is involved and no substitute is possible, it is agreed that the benefit originally provided shall be replaced with one of equal worth.

## ARTICLE XVII
### Safety

The Union and the Employer agree that safety of the workplace is of paramount importance and the Employer, the Union and Local Union agree to abide by all appropriate federal, state, provincial and local safety laws and regulations and any and all safety regulations established by an owner or his representative at a particular jobsite.

## ARTICLE XVIII
### General Understanding

This Agreement constitutes the entire agreement between the parties, and any local or area collec-

tive bargaining agreement which may be in conflict with the provisions contained in this Agreement shall be subordinated to this Agreement. Except for local agreements for which the Employer participates in local negotiations, the terms and conditions set forth in local area agreements will be binding on the Employer only so long as this Agreement and any of its successors continue to bind the Employer, provided that such terms and conditions including the no strike, no lockout clause will remain in effect on any ongoing project begun under this Agreement until either the project is completed or the jobsite local area agreement is no longer in effect.

The Employer agrees that if it has not previously done so, it will, upon the Union's submission of evidence of majority status among its employees in the bargaining unit described herein, voluntarily recognize the Union as the exclusive representative as defined in Section 9(a) of the National Labor Relations Act, as amended, of all employees within that bargaining unit on all present and future jobsites within the jurisdiction of the Union. The Employer expressly agrees that it will not condition its recognition upon the results of an election conducted under the rules and regulations of the National Labor Relations Board.

We the undersigned Employer on behalf of the parent firm, all subsidiaries and corporate related firms, companies and/or corporations hereby become signatory to the Special International Masonry Industry Agreement and agree to abide by the full terms and conditions of this Agreement effective as of this date.

Signed on this 31st day of January, 1992.

Joseph Cohn & Son Inc.
*Name of Company*

By: Louis Monico Jr.
President
*Title*
444 Chapel Street
*Street Address*
New Haven, CT
*City, State or Province*
(203)772-2420
*Telephone Number*

*International Union of Bricklayers and Allied Craftsmen*

Gerald Carlisle

Names and address of all subsidiaries and corporate related firms, companies and/or corporations.

9

NOU 20 '98 10:26

Exhibit B

*CT 8798*

> CT 1987 98 A

## A G R E E M E N T

between

LABOR RELATIONS DIVISION,

THE ASSOCIATED GENERAL CONTRACTORS OF CONNECTICUT, INC., and
MASON CONTRACTORS ASSOCIATION OF CONNECTICUT

and

DISTRICT COUNCIL OF NORTHERN CONNECTICUT

of the

INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTSMEN, AFL-CIO

May 6, 1987 through March 31, 1990

This is a copy from the IUBAC Document Management System..

# TABLE OF CONTENTS

| | | PAGE NO. |
|---|---|---|
| ARTICLE I | OBJECT | 1 |
| ARTICLE II | TERRITORIAL JURISDICTION | 1 |
| ARTICLE III | EQUAL EMPLOYMENT OPPORTUNITY | 3 |
| ARTICLE IV | UNION MEMBERSHIP | 3 |
| ARTICLE V | WAGES, HOURS & WORKING CONDITIONS | 4 |
| ARTICLE VI | HEALTH & SAFETY STANDARDS | 7 |
| ARTICLE VII | BUSINESS REPRESENTATIVE | 8 |
| ARTICLE VIII | STEWARDS | 9 |
| ARTICLE IX | JURISDICTIONAL CLAIMS | 10 |
| ARTICLE X | WORK RULES | 13 |
| ARTICLE XI | APPRENTICESHIP | 15 |
| ARTICLE XII | INSURANCE | 16 |
| ARTICLE XIII | STATE AND FEDERAL LAWS | 16 |
| ARTICLE XIV | WORK STOPPAGES | 17 |
| ARTICLE XV | GRIEVANCE, MEDIATION & ARBITRATION PROCEDURE | 17 |
| ARTICLE XVI | FRINGE BENEFIT FUNDS | 19 |
| ARTICLE XVII | DUES CHECK-OFF | 21 |
| ARTICLE XVIII | BUILDING & CONSTRUCTION PROGRAM | 23 |
| ARTICLE XIX | CONNECTICUT MASONRY INDUSTRY PROMOTION FUND | 23 |
| ARTICLE XX | MANAGEMENT PREROGATIVES | 24 |
| ARTICLE XXI | FOREMAN | 24 |
| ARTICLE XXII | SEVERABILITY | 24 |
| ARTICLE XXIII | TERM OF AGREEMENT | 25 |
| | ACCEPTANCE OF AGREEMENT | 26 |

- 1 -

## AGREEMENT

This Agreement is made and entered into on this 6th day of May, 1987 by and between the LABOR RELATIONS DIVISION, THE ASSOCIATED GENERAL CONTRACTORS OF CONNECTICUT, INC., and the MASON CONTRACTORS ASSOCIATION OF CONNECTICUT its successors or assigns, hereinafter referred to as the "Association", acting for and on behalf of firms it is authorized and agrees to represent, each hereinafter referred to as the "Employer", and the DISTRICT COUNCIL OF NORTHERN CONNECTICUT, hereinafter referred to as the "Union", acting for and on behalf of Local Unions No. 1, 2, 3, 6, 12, 15, 16, 19 and 22 of the INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTSMEN, AFL-CIO and their successors and assigns each of which is hereafter referred to as the "Local Union" or "Unions". The Council and the Local Union or Unions hereinafter individually and collectively shall be referred to as the "Union".

## ARTICLE I

### OBJECT

In order to insure the public against conditions of the past, to prevent strikes or lockouts and to insure a peaceable adjustment and settlement of any and all disputes and differences that may arise between any of the parties to this Agreement without stoppage of work, and to bring about as near as possible at this time uniform conditions that will tend to stabilize and encourage construction, alteration and repair of buildings, both parties have entered this Agreement.

## ARTICLE II

### TERRITORIAL JURISDICTION

This Agreement shall apply to all work performed in covered employment within the territorial jurisdiction of the Union. Following is the geographical jurisdiction of each Local Union party to this Agreement:

Hartford Local No. 1 - 68 Preston Street, Hartford, Connecticut 06114
Telephone: 246-8651

    Territory:      Andover, Avon, Bloomfield, Bolton, Burlington, Columbia, Coventry, East Granby, East Hartford, East Windsor, Ellington, Enfield, Farmington, Glastonbury, Granby, Hartland, Hartford, Hebron, Manchester, Mansfield, Marlborough, Rocky Hill, Simsbury, Somers, South Windsor, Stafford, Suffield, Tolland, Union, Vernon, West Hartford, Wethersfield, Willington, Windsor, Windsor Locks

Bridgeport Local No. 2 - 679 North Avenue, Bridgeport, Connecticut 06606
Telephone: 334-5498

    Territory:      Bridgeport, Easton, Fairfield, Milford (West of Indian River to Orange Town Line in the North), Monroe, Stratford, Trumbull

This is a copy from the IUBAC Document Management System.

- 2 -

New Britain Local No. 3- 109 Henry Street, New Britain, Connecticut 06051
Telephone:  229-9332

     Territory:       New Britain, Newington, Berlin, Meriden,  Southington,
Wallingford, Cheshire (North of Route 68)

New Haven Local No. 6 -  45 Water Street, New Haven, Connecticut 06511
Telephone:  562-8536

     Territory:       New Haven, West Haven, North Haven,  East  Haven, part
of  Milford,  Orange,  Woodbridge,  Bethany,   Hamden,
Branford, North Branford, Guilford,  Madison and parts
of Cheshire

New London Local No. 12- 19 Fairlawn Street, Waterford, Connecticut 06385
Telephone:  443-1998

     Territory:       Middletown, Middlefield, Cromwell, Portland,  East
Hampton, Haddam, Durham, Killingworth,  Chester,  Deep
River,  Essex,  Clinton,   Westbrook,  Old  Saybrook,
Colchester,  Lebanon, Windham, Hampton,  Brooklyn,
Killingly,  Putnam,  Thompson,  Woodstock,  Eastford,
Ashford,  Pomfret,  Chaplin,  New London,  Groton,
Stonington, North Stonington, Waterford, East  Lyme,
Old Lyme, Lyme, Norwich, Ledyard, East Haddam, Lisbon,
Preston,  Griswold,  Voluntown, Sterling,  Plainfield,
Canterbury,  Scotland,  Sprague,  Franklin,  Bozrah,
Montville, Salem

Derby Local No. 15 -    152 Christian Street, Oxford, Connecticut 06483
Telephone:  888-5079

     Territory:       Ansonia, Derby, Shelton, Oxford, Southbury, Seymour

Waterbury Local No. 16 - 21 Fulton Street, Waterbury, Connecticut 06708
Telephone:  756-0361

     Territory:       Waterbury,  Prospect,  Naugatuck,  Beacon  Falls,
Middlebury, Woodbury, Watertown,  Thomaston, Wolcott,
Bristol, Plymouth, Plainville, Terryville

Torrington Local No. 19- 781 Torringford East Street, Torrington, Connecticut
06790
Telephone:  489-6396

     Territory:       Torrington,  New  Hartford,  Canton,  Norfolk,
Barkhamsted,  Colebrook, Winchester, Canaan,  North
Canaan, Salisbury, Sharon, Cornwall, Goshen,  Warren,
Washington, Morris, Litchfield, Harwinton, Bethlehem

Danbury Local No. 22 -   59 Sheridan Street, Danbury, Connecticut 06810
Telephone:  748-6194

     Territory:       Bethel, Bridgewater, Brookfield, Danbury, Kent, New
Fairfield, New Milford, Newtown, Redding, Roxbury,
Sherman

- 3 -

## ARTICLE III

### EQUAL EMPLOYMENT OPPORTUNITY

There shall be no discrimination in the referral, hiring, placement, classification, upgrading, layoff or termination of employment of any individual by reason of age, race, creed, color, sex, national origin, occupationally irrelevant physical handicaps or membership or nonmembership in the Union. The Union agrees to support and actively participate in affirmative action programs to promote equal employment opportunity in the construction industry.

## ARTICLE IV

### UNION MEMBERSHIP

Section 1. All employees who are members of the Union at the time of the signing of this Agreement shall continue membership in the Union. All other employees must become members of the Union on or after the eighth (8) day following the beginning of employment or the date of this Agreement, whichever is later, and must maintain their membership in the Union as a condition of employment to the extent of tendering the periodic dues and the initiation fees uniformly required by the Union as a condition of acquiring or maintaining membership therein.

Section 2. The Union agrees to remain in compliance with the provision of Section 9 of the Labor Management Relations Act, 1947, as the same may be amended from time to time, to the extent required by Section 8 (a) (3) of such Act.

Section 3. On all work covered under the jurisdiction of this Agreement, the District Council of Northern Connecticut shall be given the first opportunity to refer applicants for employment with whichever BAC Local (1, 2, 3, 6, 12, 15, 16, 19 and 22) having jurisdiction over the work, being given the first opportunity to refer applicants for employment for up to 75% of the jobs available during the entire course of the work. The Employer reserves the right to select the applicant to be hired, and there shall be no discrimination in referrals or hiring by reason of membership or non-membership in the Union. The second opportunity for referral for employment shall be given to the District Council of Northern Connecticut. In case of a lay-off, employees will be laid off in inverse order of job seniority.

If workmen are not available from within the District Council of Northern Connecticut to refer applicants for the jobs covered by this Agreement, the Employer will accept referrals from other locals or District Councils. Non-working foremen shall not be included for purposes of establishing 75% of the available jobs.

- 4 -

## ARTICLE V

### WAGES, HOURS AND WORKING CONDITIONS

**Section 1.**    Employees covered under this Agreement shall receive the following regular straight time hourly rate of pay for all time worked during the regular work day on and after the effective dates indicated for each local Union herein below:

DISTRICT COUNCIL OF NORTHERN CONNECTICUT
LOCAL NOS. 1, 2, 3, 6, 12, 15, 16, 19, and 22

| EFFECTIVE DATE | WAGE |
|---|---|
| 05/06/87 | 18.90 |
| 10/05/87 | 19.10 |
| 04/04/88 | 19.60 |
| 10/03/88 | 20.10 |
| 04/03/89 | 20.85 |
| 10/02/8ᵧ | 21.60 |

Should there be need to increase the rates of contribution payable to the health and/or pension benefit funds provided for in ARTICLE XVI, Fringe Benefit Funds, Section 1. of this Agreement during the term of this Agreement, the appropriate regular straight time hourly rate of pay provided in this ARTICLE V, Section I above shall be reduced by such amount and the appropriate health and/or pension benefit fund contribution rate provided in ARTICLE XVI, Section 1. of this Agreement shall be increased by such amount after adequate time, not less than sixty (60) days, for notice to Employers. The parties agree to execute amendments to this Agreement to accomplish the objectives of this paragraph should the need arise.

**Section 2.**    (a) The regular work week shall consist of five eight (8) hour days, Mondays through Fridays, for a total of forty (40) hours.  The regular work day shall begin at 8:00 a.m. and end at 4:30 p.m. with one-half  (1/2)  hour unpaid lunch period between 12:00 noon and 12:30 p.m.

(b) The normal starting time shall be 8:00 a.m. or such other time as that established by the Employer in consideration of adverse weather or other conditions beyond the Employer's control, but no employee shall be disciplined for leaving the job site if he is not put to work prior to 9:00 a.m. or told prior to 9:00 a.m. of a definite time for starting work that day. Any employee who is transferred to another job because of weather shall not displace any employee working on that job to which he is transferred.

**Section 3.**    Overtime - Employees shall be paid the overtime rate of one and one-half (1-1/2) times their regular straight time hourly rate of pay (time and one-half) for all time worked before the regular starting time, after the regular quitting time and during lunch periods on regular work days and on Saturdays.  Employees shall be paid the overtime rate of two times their regular straight time hourly rate of pay (double time) for all time worked on Sundays and holidays.  There shall be no pyramiding of overtime.

**Section 4.**    (a) The Employer shall establish one day each week, Monday through Thursday, as the regular pay day for its employees.  If a regular pay day falls on a holiday, recognized in Section 5 hereof, employees shall be paid before quitting time on the normal work day immediately preceding the holiday, where practical.

- 5 -

(b) The Employer shall pay employees by cash or check, and shall accompany each payment with an itemized written statement setting forth the payroll period, the gross pay for said period, the hours worked, and an itemized list of deductions from the employee's gross pay.

Section 5.   Recognized holidays, without pay, shall be as follows:   New Years Day; Good Friday; Memorial Day; Independence Day; Labor Day; Thanksgiving Day; and Christmas Day.   Under no circumstances shall work be scheduled for Labor Day, except in cases of extreme emergency involving life or property.   In the event any of the above holidays falls on a Sunday, it will be observed on the following Monday.   When Christmas Eve and New Year's Eve fall on a regular workday, Monday through Friday, employees shall be entitled to stop work at noon without loss of pay for the full day.   However, in the event the employees are prevented from working on these days because of weather or other conditions beyond the Employer's control, they shall receive only four (4) hours pay for the day at the regular hourly rate.

In the event an employee is laid off within five (5) working days prior to Christmas Eve, he shall be paid for Christmas Eve in accordance with the provisions of this section provided he has been employed by the Employer for a period of one calendar month (31) days immediately preceding the date of said lay off; and, in the event he is laid off within five (5) working days prior to New Years Eve, he shall be paid for New Years Eve in accordance with the provisions of the section, provided he has been employed by the Employer for a period of one calendar month (31) days immediately preceding the date of said lay off.

Section 6.   Any employee requested to report for work by an Employer, or his representative, who is not put to work after bringing his tools on the job, shall receive two (2) hours pay provided the employee is not prevented from working by conditions caused by adverse weather, in which event the employee shall be signed in and put to work on the next day when there is work available, weather permitting.

Any employee or employees who commence working and are held up because of weather conditions, during the first hour of work shall receive nothing less than one (1) hour of pay unless they voluntarily leave the job.   If any employee is held up after the first hour of work has been completed, such employee shall receive his pay to the nearest hour following the cessation of work.

Section 7.   Any employee or employees laid off during regular morning working hours shall be paid up to 12:00 noon, and if laid off in the afternoon, shall be paid up to 4:30 p.m.

Section  8.   Employees shall be paid for lost time due to the erection or stocking of scaffolds or waiting for materials that are already on the job, except in the event of equipment breakdown.   Ladders must be attached to all scaffolding four (4) feet high or over.

Section 9.   Employees shall receive regular pay when being transferred from one job to another during regular working hours.

Section 10.   There shall be only one scale of journeymen wage on one job and the highest scale shall prevail.

- 6 -

**Section 11.**  Should any Employer willfully work his employees beyond the established quitting time, the employees working on the job shall be paid to the next nearest one-half hour at the over-time rate, and it shall be the duty of any employee to report any information relative to the violation of this Section to the Union.  It is understood that this provision shall not be used to allow the Employer to lay out new work after the established quitting time.

**Section 12.**  Wages shall be paid any time between 8:30 a.m. and the established quitting time on the job.  No more than three (3) days pay shall be kept back by any Employer after the close of its payroll week.  In case of inclement weather on pay day, the pay shall be on the job by 10:30 a.m., where practical.

**Section 13.**  Any employee not receiving his money on the specified pay day shall recieve waiting time at the regular rate of wages until paid.  Waiting time shall be defined in Section 14.

**Section 14.**  All employees entitled to receive waiting time and requesting it and not receiving it, shall report to the Business Representative, or if not available report to the Executive Board of the Local involved for settlement. No more than two (2) days waiting time will be demanded or required on any job, unless the job is placed in the hands of a Bonding Company or Receiver, for completion.

**Section 15.**  No employee shall be laid off before the established starting time unless he was absent at the end of the preceding normal work day when work was available.

**Section 16.**  The Employer shall see that a suitable shed or locker is available for the use of employees covered by this Agreement.

**Section 17.**  In case of layoff or discharge of an employee, the employee will be notified of such discharge or layoff at least one half hour before quitting time during which time the employee shall pick up his tools and be paid whatever wages are due him.  The employer shall give the employee an Unemployment Compensation Slip at the time of discharge or layoff.

**Section 18.**  Any employee who willfully quits work or who is discharged for intoxication or the cause shall not be entitled to any of the layoff or discharge pay benefits provided for in this Article V.

**Section 19.**  There shall be no lost time on the day of injury for any employee injured on the job and obliged to receive immediate medical attention or treatment.

**Section 20.**  All employees who work on jobs where they are exposed to extreme man-made temperatures, uncleanliness, dust, mastics or in the laying of fire brick or acid brick or any other material that may be injurious to the health, shall be given ten (10) mintues to wash up before 12 noon and fifteen (15) minutes to wash and adjust proper clothing before quitting time.  No employees shall leave the premises before the established quitting time.

**Section 21.**  In no event shall the Employer be required to pay higher rates of wages or fringe benefit contributions or be subject to more favorable working rules than those established by the Union for any Employer engaged in similar work.

- 7 -

<u>Section 22.</u> Shift Provision - Shift work may be permitted by mutual agreement between the Union and the Employer under the following conditions:

(a) Where a job has more than one (1) eight (8) hour shift in any one (1) twenty-four (24) hour period, bricklayers will not be permitted to work more than one (1) shift in any one (1) work day.

(b) All employees on shift work shall receive a full normal work day's pay.

(c) Seven and one-half (7-1/2) hours work shall constitute the shift period during the second shift and seven (7) hours work during the third shift. There shall be a one-half (1/2) hour lunch period at the mid-point of the second and of the third shift.

(d) Where no third shift exists, time worked beyond the end of the second shift shall be paid for at the overtime rate.

(e) No shift work will be permitted for less than three (3) consecutive regular work days.

(f) Shift conditions and wages shall apply to alteration work in occupied areas without the requirement that work be performed during the regular work day, provided a written shift permit is issued by the Union.

(g) When an employer wishes to work bricklayers for the second or third shift periods, he shall notify the Union in writing within twenty-four (24) hours prior to the shift so that proper arrangements shall be made.

ARTICLE VI

HEALTH AND SAFETY STANDARDS

<u>Section 1.</u>  The Employer, the Union and the employees shall abide by the provisions contained in the Federal Williams-Steiger Occupational Safety and Health Act and the Connnecticut Safety Construction Act.

<u>Section 2.</u>  Employee shall abide by all safety regulations promulgated by the Employer, and an employee shall report to the Employer every injury which he incurs in the course of employment on the day such injury occurs.

<u>Section 3.</u>  Any masonry unit of concrete, cinder or like materials weighing 40 pounds or more shall be set by two masons.

<u>Section 4.</u>  All walls built of the above designated units shall only be raised six (6) courses for scaffolding height.

<u>Section 5.</u>  All employees covered by this Agreement shall be fully protected from overhead work.

<u>Section 6.</u>  No employee covered by this Agreement shall work over an open salamander, it being injurious to health. All stoves shall have a pipe connection to carry off the fumes to the outside of the building.

- 6 -

Section 7. Excessive dust, carborundum or other wheel or so-called saws for the use of cutting any brick, or block, shall have a blower or wet wheel to remove from the atmosphere any dust created by such process. The Employer shall furnish all necessary tools for this oepration, also glasses, nose protection, gloves, considered necessary for the health of the operator.

Section 8. When using machines in the performance of work, men and machines shall be properly guarded to prevent possible injury, all safety devices to be supplied by the contractor and no safety devices to be removed from such machines.

Section 9. No employee shall be required to work where he is subject to excessive dust or grit caused by masonry cutters or grinders. This does not pertain to the operator who shall be adequately protected.

Section 10. The Employer shall provide a place to operate the masonry saw which is protected from weather conditions (including providing heat when necessary) wherever possible and shall provide the journeymen operating the saw with necessary safety equipment.

Section 11. Foot scaffolds shall not be permitted with the exception of Brisk or Larson systems of waterproofing or their equivalent. This clause not to be applied to adjustable scaffolding.

Section 12. Scaffolding used for washing down shall be no less than three (3) ten inch planks in width.

Section 13. Any safety or protective clothing and/or equipment furnished to employees by the employer shall remain the property of the Employer and shall be returned in good condition to the Employer when no longer in use on the project. Each employee, if required by the Employer, shall sign a receipt for said clothing and/or equipment at the time he receives it, and he shall be held responsible for the cost of replacement of any such clothing and/or equipment which is not returned in reasonably good condition, considering normal wear and tear, to the Employer.


ARTICLE VII

BUSINESS REPRESENTATIVE

Section 1. The Business Representative shall be permitted at all times during working hours to enter all buildings or any part of such buildings during the course of construction to interview the shop steward or any member working on the job to discuss questions concerning Union business.

Section 2. The Business Representative can inspect any working member's pay stub or envelope during the job.

Section 3. The Shop Steward shall be appointed by the Business Representative.

- 9 -

## ARTICLE VIII

### STEWARDS

<u>Section 1.</u>  The first member to start to work on any job shall act as shop steward until he or some other member is duly appointed by the Business Representative from among the Employer's employees working on the particular job. There shall be no non-working stewards.

<u>Section 2:</u>  Any employee appointed by the Union or Business Representative to serve as shop steward must be able to speak and read the English language and he must be competent to perform the work available in the branch of the trade to which he is assigned. His authority, however, is recognized as subordinate to that of the Business Representative.

<u>Section 3.</u>  The steward shall be allowed a reasonable amount of time during normal working hours without loss of pay to perform the following functions.

(a) adjust all grievances and complaints in accordance with his role under the Grievance Procedure, and if he is unable to do so, he shall be permitted to call the Business Representative;

(b) examine the dues books of employees on the job;

(c) see that the Employer supplies a suitable tool house with a minimum of nine (9) square feet per man heated in cold weather from October 1 to April 1, where employees may eat meals in comfort. It shall be separte from any material shed and shall be provided with a lock, with a key in the steward's possession;

(d) open the aforesaid shed fifteen (15) minutes before starting and stopping of work;

(e) see that the Employer supplies all lines and furnishes drinking water in a covered vessel with individual drinking cups;

(f) see that proper toilet facilities are provided.

<u>Section 4.</u>  The Employer shall be responsible for the loss of masonry tools after working hours as a result of fire or breaking and entering of the tool shanty, up to One Hundred Dollars ($100.00) per man, providing the employee, before starting work on the project furnishes the Employer a written inventory of his tools and the replacement cost thereof, verified by a representative of the Employer.

<u>Section 5.</u>  Each shop steward shall appoint a temporary steward to assume his responsibilities in any case of absence.

<u>Section 6.</u>  (a) The Steward shall remain at work so long as any employee in the branch of the trade in which the steward is working remains at work or until the completion of work, provided he is qualified to perform the available work.

(b) No Steward shall be transferred to another job without prior notice to the Business Representative.

(c) When workers are all laid off before the job is completed, for reasons beyond the contractor's control, the steward shall have the first preference of being called back when the job starts up again. Punch list not included.

- 10 -

<u>Section 7.</u>  If any work must be performed by a single employee after the regular working hours, the shop steward is not to replace that employee if such employee had the assignment during regular working hours.

<u>Section 8.</u>  There shall be no interference with the  steward  in his reasonable performance  of  the  duties  set  forth  herein.  The  Steward shall  not  be discharged  or  discriminated  against for his proper performance of the duties set forth herein.

<u>Section 9.</u>  All employers shall call the Local Union when the job starts.

ARTICLE IX

JURISDICTIONAL CLAIMS

<u>Section 1.</u>  The  Employer  acknowledges that the Union claims items  of  work listed in the International Constitution and Rules of Order as set forth below, to  be  within its work jurisdiction.  In making work assignments, the Employer shall consider area  practice,  work  ordinarily  and  customarily performed by employees covered by this  Agreement  and  work jurisdiction agreements between International Unions.

A.  <u>Brick Masonry</u> - Bricklaying  masonry  shall  consist  of the laying of bricks made  from any material in, under or upon any structure or form of work where  bricks  are used, whether in the ground, or over its surface, or beneath water; in commercial buildings, rolling mills,  iron-works,  blast  or smelter furnaces,  lime  or  brick kilns;  in  mines  or fortifications,  and  in  all underground work, such as sewers, telegraph electric and telephone conduits.

All cutting of joints, pointing, cleaning  and  cutting  of  brick walls, fire-proofing, block-arching,  terra-cotta cutting  and  setting,  the  laying  and cutting  of all tile, plaster, mineralwool, cork blocks and glass  masonry,  or any  substitute  for  above material, the laying of all pipe sewers of conduits are  of  any  vitreous material, burnt clay or cement, the cutting rubbing, and grinding of all kinds  of  brick  and the setting of all cut stone trimmings on brick buildings, is bricklayers' work.

B.  <u>Stonemasonry</u>  -  Stone  masonry  shall consist of laying all rip rap, rubble work,  with  or without mortar.  Setting all cut stone, marble, slate or stone work (meaning as to stone, any work manufactured  from  such  foreign  or domestic products as are specified  and used in the interior or the exterior of buildings by architects, and customarily called "stone" in the trade).  Cutting all shoddies, broken ashlar or random ashlar that is  roughly  dressed upon the beds  and  joints, and range ashlar not over ten inches in height; the dressing of all jambs,  corners  and ringstones that are roughly dressed upon the beds, joints or reveals, and the cutting of a  draft  upon same for plumbing purposes only; and the cleaning, cutting of joints and pointing of stone work.

This is to apply to all  work on  buildings,  sewers,  bridges, railroads, bulkheads,  breakwaters, jetties, or other public works, and to  all  kinds  of stone,  particularly  to  the  product  of the locality where the work is being done, and the same shall be considered stonemasonry.

Stonemasons shall have the right to use all tools which they consider necessary in the performance of their  work.   Foremen over  any  stonemasonry or stone setting shall  be  a  stonemason  or  stone setter, and at no time shall anyone other  than a bona fide stonemason or stone setter act as a foreman on all stone masonry.

This is a copy from the IUBAC Document Management System..

- 11 -

C.   Artifical Masonry  - The cutting, setting, and pointing of cement blocks and all artifical stone or marble, either interior or exterior, when set by usual custom of the stonemason and marble setter.  All cement that is used for backing up external walls, the building of party walls, column, girder, beams, floors, stairs and arches and all material substituted for the clay or natural stone products, shall be controlled by employees covered by this Agreement.

All artificical masonry, the cutting, setting and pointing of all concrete prefabicated slabs regardless of dimension size, shall be the work of employees covered by this Agreement.

D. Cement Masonry - Laying out, screeding and finishing of all cement, concrete, brown stone composition, mastic and gypsum material, also for fireproofing, waterproofing, cement and composition base and vault lights.  The cutting of all cement and concrete for patching and finishing.  The bush hammering of all concrete when cast in place.  The operation of the cement gun, the nozzle and the finishing of all material applied by guns, also the operation of the cement floor finishing machines.

The cement mason shall have the right to use all tools necessary to complete his work.

E.   Marble Masonry - Marble mason's jurisdiction claims consist of the carving, cutting and setting of all marble, slate, including slate blackboards, stone, albereen, carrara, sanioyx, vitrolite, and similar opaque glass, scagliola, marbleithic, and all artificial, imitation or cast of whatever thickness or dimension.  This shall apply to all interior work, such as sanitary, decorative and other purposes inside of buildings of every description wherever requried, including all polish honed or sand finish; also the cutting and fitting of above materials after same leave mills or shop and the laying of all marble tile, slate and terrazzo tile.

F.   Plastering - All exterior plastering, plain and ornamental when done with stucco, cement and lime mortars or patent materials, artificial marble work, when applied in plastic form, composition work in all its branches, the covering of all walls, ceilings, soffits, piers, columns, or any part of a construction of any sort when covered with any plastic material in the usual methods of plastering, is the work of the plasterer.  The casting and sticking of all ornaments of plaster or plastic composition, the cutting and filling of rods and white mortar screed and with a regular mold and all substititutes of any kind, when applied in plastic form with a trowel, or substitute for same, is the work of the plasterer.

G.   Marble Mosaic and Terrazzo Work - Marble Mosaic, Venetian Enamel and Terrazzo.  Cutting and assembling of Mosaic.  The casting of all terrazzo in shops and on jobs.

1.  All scratch coat on walls and ceilings where Mosaic and Terrazzo is to be applied shall be done by plasterers, with an allowance of not less than one-half inch bed to be conceded to Mosaic and Terrazzo workers.  All bedding above concrete floors or walls that the preparation, cutting, laying or setting of metal, composition or wooden strips and ground and the laying and cutting of metal, strips, lath or other reinforcement, where used in Mosaic and Terrazzo work, shall be the work of the Mosaic and Terrazzo workers.

- 12 -

2. All cement Terrazzo, Magnesite Terrazzo, De-O-Tex, Rustic or Rough Washed for interior or exterior of buildings, and any other kind of plastic mixtures composed of chips of marble, granite, blue stone, enamel, mother of pearl, and all other kinds of chips when mixed with cement, rubber, Magnesium, Chloride or other binding material, when used on floors, ceilings, stairs, saddles or any other part of the interior and exteriors of buildings, and also other work not considered a part of the building, such as fountains, swimming pools, etc., also all other substitutes that may be applied under the same methods on Mosaic or Terrazzo.

Cutting and assembling of Art Ceramic and Glass Mosaic comes under the jurisdiction of the Mosaic workers and setting of same shall be done by tile layers.

H. <u>Tile Layer's Work</u> - The laying or setting of all tile where used for floors, walls, ceilings, walks, promenade roofs, stair treads, stair risers, facings, fireplaces, and decorative insets, together with any marble plinths, threshold or window stools used in connection with any tile work; also to prepare and set all concrete, cement brickwork or other foundation or materials that may be required to properly set and complete such work; also to prepare and set all concrete, cement brickwork or other foundation or setting or bedding of all tiling, stone, marble, composition, glass, mosaic, or other materials forming the facing, hearth or fireplace of a mantel, or the mantel complete together with the setting of all cement, brickwork, or other material required in connection with the above work; also the slabbing and fabrication of tile mantels, counters and tile panels of every description and the erection and installation of same. The building, shaping, forming, construction or repairing of all fireplace work, whether in connection with a mantel, hearth facing or not, and the setting and preparing of all material, such as cement, plaster, mortar, brickwork, iron work, or other materials necessary for the proper and safe construction and completion of such work, except that a mantel made exclusively of brick, marble or stone, shall be conceded to be bricklayer's, marble setter's, or stonemason's work respectively.

It will be understood that the work "tile" refers to all burned clay products, as used in the tile industry, either glazed or unglazed, and to all composition materials made in single units up to 15" x20" x 2", except quarry tiles larger than 9" x 9" x 1 1/2"..., also to mixtures in tile from of cement plastics and metals that are made for and intended for use as finished floor surface, whether upon interior or exterior floors, stair treads, promenade roofs, garden walls, interior walls, ceilings swimming pools, and all places where tile may be used to form a finished surface for practical use, sanitary finish or decorative purposes or inserts in other materials.

I. <u>Pointing, Caulking and Cleaning</u> - Pointing, caulking and cleaning shall consist of the pointing, caulking, and cleaning of all types of masonry, caulking of all window frames encased in masonry on brick, stone or cement structures, including all grinding and cutting out on such work and all sand blasting, steam cleaning and gunite work.

J. <u>Cement or Concrete Block Laying</u> - The laying of cement or concrete blocks or blocks of masonry material.

K. <u>Dryvit System</u> - All work pertaining to the Dryvit and similar systems, including insulation board, primus adhesive, reinforcing fabric and all other materials, also whatever preparations it takes to perform said Dryvit System, shall be the work of plastermen or members of the I.U.B.A.C. having the skill to perform said work.

- 13 -

ARTICLE X

WORK RULES

**Section 1.**  A line must be pulled on two sides of all  double  unit walls eight (8) inches in thickness or over.  Employer shall furnish all lines.

**Section 2.**  No line shall  be  dropped  before it is laid out and tooled unless job conditions delay the tooling.  No mortar shall be spread ahead of the line and  no  line shall be raised more than one course at a time  except  to  avoid obstructions.

**Section 3.**   No employee shall be required to build a wall higher than five (5) feet  from  the  ground  or scaffold, whichever applies.  No scaffold shall  be built more than four (4) feet, six (6) inches higher than the preceding working level.  The Employer shall furnish ladders or other access to all scaffolds.

**Section 4.**  All shafts or dangerous places of similar character must be sheeted tight to the floor above and a floor below to insure  the  safety  of  the  men employed in the same and no member of this organization shall work in any shaft or opening where elevators or counterweights are running, except where there is a bank of elevators in which one non-running elevator  and  counterweight  must intervene.  This paragraph does not apply to patching work.

**Section 5.**  All mortar tubs  are  to  be raised at least eight (8) inches above ground area, on scaffolds and floor level.

**Section 6.**  Work rules for plastering work shall continue to be as follows:

(a)  On  plastering  work,  no  gauging shall be made up later than thirty minutes of 12:00 and forty-five minutes  of  the regularly established quitting time.   At  no time shall a gauging be prepared before the preceding gauging is complete  and especially no one shall prepare gauging for other than themselves except on cornice work.

(b)  The plastering inside of a building shall be left straight  with  the rod and darby.  These tools are to be furnished by the Employer.

(c)  Moulding or covers of plaster walls shall be run  with a regular mould properly screeded and run on rods.  All noses must be properly screeded and run with a regular mould on rods.

(d)  The finishing  of  plaster walls and ceilings cannot be done while the screed cornices or covers with which they intersect are not in place.

(e)  For plastering work all mortar boards shall not exceed four (4) feet x six (6) feet or an equivalent area and each gauging shall not  be more than one and one-half (1-1/2) rods per man.

(f)  There shall be no preference  given  to  either  white mortar hands or brown mortar hands in regards to working overtime or the regular work day.

(g)  All plaster mouldings or cornices, pilasters or plaster  paneling must be  run in place and where cornices are ornamented proper beds must be made  to secure same.  All plaster capitals, bases, and moulding if not ornamental, must be run on the job.

- 14 -

(h) Contractors shall furnish all screed rods, darbies and feather edges, which must be kept true and straight at all times.

(i) When plastering, the mortar boards shall be raised at least sixteen inches from the scaffold or placed on barrels or stands.

(j) When working on bottoms all work shall be plastered at least one (1) foot above scaffold height. If necessary a foot scaffold not to extend one (1) foot in height shall be allowed for this purpose.

(k) All plasterers shall be allowed ten (10) minutes clean up time before the established quitting time in which to change clothes and clean their tools.

(l) All stands for bottom work shall be no less than thirty (30) inches in height.

(m) There shall be no spacing of plank on scaffolds used for scratch, brown or white coat.

(n) For any scaffold up to four (4) feet in height, on side walls only, a scaffold twenty (20) inches in width shall be allowed. Anything four (4) feet or over in height shall be at least four (4) ten inch planks wide.

(o) No employee shall use stilts or other so called convenience which are hazardous in the opinion of the Business Representative.

(p) Drop lines shall be used at the Employer's discretion.

(q) It is agreed that the plaster work if sublet or subcontracted by the Employer, shall be given to a contractor who agrees to be bound by the terms of this Agreement. There shall be no lumping of work.

Section 7. Work rules for cement finishing work shall continue to be as follows:

(a) There must be one (1) cement mason on the laying, placing or finishing of all concrete. On the floors there shall be two cement masons or plasterers to do rodding, screeding and top dressing. This does not prohibit bricklayers and masons from being so employed providing they are qualified.

(b) There shall be three (3) men to pull any rod over twelve (12) feet in length up to sixteen (16) feet, and an additional man for every four (4) feet thereafter.

(c) During the regular working day there shall be no time lost for the cement mason while waiting for concrete to set for finishing. After the regular working day, until concrete has been properly finished, men shall be sent home at the discretion of the Employer. No cement finisher shall leave a concrete floor of over 100 square feet in an area over night and attempt to finish it on the following morning, except when said slab is exposed to rain, snow, sleet upon said slab after slab is in place or if retarding agents were used in the concrete as per architect's specifications.

Knee boards are to be used when hand troweling or floating all slabs.

(d) All cement masons shall be allowed ten (10) minutes clean-up time before the established quitting time in which to change clothes and clean their tools.

- 15 -

**Section 8.**    (a)  There shall be no more than two (2) competent men on each two-man swing scaffold, and each man shall be supplied with a safety line and belt, tied to a separate anchorage.

(b)  The erection of all two-man swing scaffolds shall be supervised and inspected by men working on said scaffold.

**Section 9.**    The shop steward and Employer on all jobs shall check together all scaffolds before being used by employees covered by this Agreement

**Section 10.**    "Coffee and", on the line. One (1) man shall get coffee and deliver it to others at approximately 10:00 a.m.  This is to be considered a privilege and will be revoked for those abusing it after prior notice to the Business Agent.

**Section 11.**    No employee shall contract by the unit, or lump work of any character, covered by our classification of work, or work for any person or persons contracting work by the unit, or lump work of any character, taken from general contractors, without furnishing material.

**Section 12.**    Every journeyman shall tool off his own work.

**Section 13.**    The Employer shall not put up the line unless he is working on the lead nor shall he demand the line to be raised before it is laid.

## ARTICLE XI

### APPRENTICESHIP

**Section 1.**    Apprentices and the apprenticeship program established and maintained pursuant to this Agreement shall be under the direction and control of a Joint Apprenticeship Committee, known as the District Council of Northern Connecticut Joint Apprenticeship Committee (hereinafter referred to as the "Committee"), which shall at all times be comprised of an equal number of representatives from the Union and the Association. The Committee shall have authority to function as a committee when there is at least one (1) representative of the Association and one (1) representative of the Union present at a Committee meeting, but irrespective of attendance, the voting power of the Association and the Union shall always be equal.

**Section 2.**    All apprentice dues books shall be the official and only bona fide identification of apprentices registered in this jointly sponsored program.

**Section 3.**    The Committee shall register the training program and all apprentices under supervision of the Committee with the Connecticut State Apprentice Council recognized by the Federal Committee on Apprenticeship.

**Section 4.**    The Committee shall cooperate with the Bureau of Apprenticeship, United States Department of Labor, Connecticut State Apprenticeship Council, Connecticut State Agencies and trade related industries in advancing the training skills of apprentices.

**Section 5.**    The Employer shall be responsible for the proper consideration of all apprentices under their supervision and provide every opportunity to develop and advance the skills of apprentices.

- 16 -

<u>Section 6.</u>  The apprentice shall train in all branches of the trade. The apprentice supervisor shall make changes of the apprentices if he sees the apprentice is not getting a fair share of all branches of the trade. No apprentice shall be exploited by being used for continuous periods on such jobs as washing down, cutting on the saw and rubbing concrete. The apprentice shall work on washing down or cutting on the saw for not more than one (1) month each year for each operation.

<u>Section 7.</u>  All parties to this Agreement shall adhere to the apprenticeship rules and regulations and standards approved by the Committee and the Connecticut State Apprenticeship Council.

<u>Section 8.</u>  The Employer shall contribute ten ($.10) cents for each hour worked to the Joint Apprenticeship Committee at the consumation or signing of the Agreement, to defray the cost of administration of the Apprenticeship Program; said Fund shall be subject to provision of applicable law and shall be administered by the Joint Apprenticeship Committee.

<u>Section 9.</u>  "Employers shall hire (1) one apprentice immediately after employing the (7th) seventh journeyman."

<u>Section 10.</u>  One Craft Apprentice - 3 years

        1st 750 hours 40% of journeymen wage rate
        2nd 750 hours 45% of journeymen wage rate
        3rd 750 hours 50% of journeymen wage rate
        4th 750 hours 60% of journeymen wage rate
        5th 750 hours 70% of journeymen wage rate
        6th 750 hours 80% of journeymen wage rate

Combination of Two or More Craft Apprentices - 4 Years

        1st 750 hours 40% of journeymen wage rate
        2nd 750 hours 45% of journeymen wage rate
        3rd 750 hours 50% of journeymen wage rate
        4th 750 hours 60% of journeymen wage rate
        5th 750 hours 70% of journeymen wage rate
        6th 750 hours 80% of journeymen wage rate
        7th 750 hours 85% of journeymen wage rate
        8th 750 hours 90% of journeymen wage rate

### ARTICLE XII

### INSURANCE

The Employer shall carry, on behalf of all employees covered under this Agreement, Workmen's Compensation Insurance, through a carrier licensed to do business in the State of Connecticut, and shall make Unemployment Compensation payments as required by law. The Employer shall provide the Business Representative of the Union with evidence of such coverages upon request.

### ARTICLE XIII

### STATE AND FEDERAL LAWS

It is assumed by the parties hereto that each provision of this Agreement is in conformity with all applicable laws of the United States and the State of Connecticut. Should it later be determined that it would be a violation of any legally effective Government or State order or statutes to comply with any

This is a copy from the IUBAC Document Management System.

- 17 -

provision or provisions of this Agreement, the parties hereto agree to renegotiate such provision or provisions of this Agreement for the purpose of making them conform to such laws or statutes for as long as they shall remain effective and the other provisions of this Agreement shall not be affected thereby.

## ARTICLE XIV

### WORK STOPPAGES

**Section 1.** It is agreed that there shall be no work stoppages during the term of this Agreement except for the following causes only, and only forty-eight (48) hours (weekends excluded) after notice from the Union has been received by the Employer and the Association which clearly states the Union's intention to strike for:

"Willful non-payment of wages and or fringe benefit contributions as required by this Agreement for time actually worked by employees covered under this Agreement."

The notice required by this Section shall be by telegram, registered or certified mail, and shall be authorized and signed by the appropriate Business Representative.

**Section 2.** Except as specifically provided in Section 1 above, there shall be no work stoppages, strikes, slow-downs or other interference with the progress of the work during the term of this Agreement.

## ARTICLE XV

### GRIEVANCE, MEDIATION AND ARBITRATION PROCEDURE

**Section 1.** A grievance shall be defined as any dispute arising between the parties concerning interpretation and/or application of this Agreement during the term of this Agreement. The Union, the Employer, and/or the Association may file and process a grievance as provided herein.

**Section 2.** There shall be a Joint Arbitration Committee hereinafter referred to as the "Committee", made up of two representatives of the Association and two representatives of the Union which shall hear grievances referred to it by the Employer, the Association and/or the Union.

**Section 3.** All grievances between an employee or group of employees on the one hand and the Employer on the other shall be processed in accordance with the following procedures:

Step 1. The steward shall first discuss the grievance with the Employer's superintendent in an attempt to resolve the matter informally.

Step 2. If the grievance is not resolved in Step 1 above, the Steward shall submit it to the Business Representative within two (2) working days after the occurrence which shall have given rise to the grievance. The Business Representative shall then discuss the grievance with the job superintendent or an officer of the Employer in a further attempt to resolve the matter informally.

This is a copy from the IUBAC Document Management System..

- 18 -

Step 3.    If the grievance cannot be resolved in Step 2 above, the Business Representative shall send notice to the Employer and the Association within four (4) working days after the occurrence which shall have given rise to the grievance requesting consideration by the Committee of the grievance.    Such notice shall be by registered mail or telegram and must give the names of all parties involved, job site location and full particulars of the grievance including appropriate dates and ARTICLE(S) and Section(s) of this Agreement which the Union alleges have been violated.

Section 4.    Either the Employer or the Association may submit a grievance for consideration by the Committee by sending notice to the Union requesting such consideration.    Such notice shall be by registered mail or telegram and shall give details of the grievance.    A copy of any such notice by the Employer shall be sent to the Association.

Section 5.    The Committee shall meet to consider the grievance within five (5) working days after the request for such consideration has been received by either the Association or the Union.    The grievance shall be deemed settled and resolved in accordance with the majority vote of the Committee, and the Committee's decision shall be binding upon the parties to the grievance.

Section 6.    In the event the Committee is deadlocked or is otherwise unable to resolve a grievance which involves the interpretation or application of specific provisions of this Agreement within five (5) days after it first meets or should have met, either the Association or the Union may submit the grievance.    Such submission must be made within ten (10) working days after the Committee is deemed unable to resolve a grievance as provided herein.

Arbitration composed of two arbitrators appointed by the employer and two arbitrators appointed by the Union.    These four arbitrators shall immediately select a neutral arbitrator as Chairman of the arbitration process.

Should the four arbitrators fail to agree on the selection of the neutral Chairman, application shall be made by the grieving party, if management, to the American Arbitration Association, if Labor, to the Connecticut State Board of Mediation and Arbitration for a list of five (5) arbitrators available to hear and settle the grievances at issue.    The arbitrators appointed by each, the employer and the Union, shall each alternately strike two (2) names from the list supplied, the first strike being determined by chance.    The remaining name shall become the neutral arbitrator, and shall be responsible for setting the time and place of the hearing.

Section 7.    If either party refuses to participate in the selection of an impartial umpire, the other party shall select such umpire.

Section 8.    If either party fails to appear at an arbitration proceeding before an impartial umpire, the umpire shall proceed ex parte.

Section 9.    The grieving party will bear the cost of arbitration.

Section 10.    The parties to this Agreement agree that there shall be no strikes or lockouts, except as specifically provided in this Agreement, during the term of this Agreement.    If either party alleges that the other party is engaging in a strike, lockout or refusal to permit the Business Representative access to the job, the aggrieved party may proceed directly under Section 6 of this Article without regard for the previous steps or their respective time limits.

- 19 -

ARTICLE XVI

FRINGE BENEFIT FUNDS

Section 1.    Employers hereunder shall make contributions to the fringe benefit trust funds enumerated, hereinafter referred to as the "Funds",  in the amounts set forth below for  each  hour  worked  by  each  employee covered under this Agreement on and after the effective dates indicated.

### LOCAL UNIONS NO. 1, 2, 3, 6, 12, 15, 16, 19 & 22

**Connecticut Bricklayer & Allied Craftsmen Health Fund**

| Effective Date | Hourly Amount |
|---|---|
| May 6, 1987 | $ 1.90 |

**Connecticut Bricklayers Pension Fund**

| Effective Date | Hourly Amount |
|---|---|
| May 6, 1987 | $ 1.30 |
| October 5, 1987 | 1.80 |

**International Union Pension Fund**

| Effective Date | Hourly Amount |
|---|---|
| May 6, 1987 | $  .25 |

All such payments to the Funds are to be made in such manner  and  at such time as the Trustees of the respective Funds shall determine,  but in no event shall such contributions be required to be  paid  more  often than monthly, or sooner than the  10th day of the month following the month in which said contributions were earned.  The Trustees shall apply such contributions to provide  such plan or plans of benefits for  eligible  employees  as the Trustees shall determine. The Employer shall be liable to pay contributions provided above only for hours worked in covered  employment  in  the geographical jurisdiction covered by the respective Funds as indicated.  In  no  event  shall  the Employer be liable to make duplicate contributions to more than one  Fund  providing the same type of benefits.

- 20 -

**Section 2.**   The Funds shall be maintained at all times as jointly administered Taft-Hartley trust funds with an equal number of employer trustees, selected by the Association, and labor trustees, selected by the Union as might be appropriate, herein referred to as the "Trustees", serving and with such powers and duties, all as may be provided from time to time by the applicable Trust Agreement. The Funds shall furnish to Association and the Union copies of their respective annual audit reports and annual actuarial or consulting reports and information concerning contributions received or due as might be requested from time to time.

**Section 3.**   Each Fund shall at all times be operated in conformance with applicable Federal and State laws and regulations, and shall be maintained as a tax exempt trust under provisions of the Internal Revenue Code so that Employer contributions to said Fund shall at all times be deductible by the Employer for Federal income tax purposes. In the event that a Fund fails to retain approval as a tax exempt trust so that Employer contributions shall not be deductible as a business expense, the Employer shall not be liable to contribute to such Fund for hours worked during the period that the contribution is not deductible.

**Section 4.**   At the discretion of a Fund's Trustees, an Employer determined to be delinquent in its payments as required herein may be required to post a $10,000 cash bond and be held liable for all contributions due to the Fund and reasonable attorney's fees, court costs, audit fees and other expenses incurred incidental to collection of contributions due the Fund, including a reasonable rate of interest on contributions due. Appropriate payroll records of the Employer may be subject to audit by the Trustees or their authorized representative upon reasonable notice. The Trustees shall have all powers with respect to the audit of appropriate payroll records and the collection of delinquent contributions, interest, audit fees, attorney's fees and other expenses of collection as may be provided from time to time by the applicable Trust Agreement.

**Section 5.**   Nothing in this Agreement, the Trust Agreement, a plan of benefits or any other document shall be construed to impose upon the employer or other contributor any liability or obligation to contribute or make any other payments to any Fund toward the cost of benefits or the cost of administration or funding to the Plan beyond the obligation of the Employer to make contributions and pay expenses of collection as specified in Sections 1 and 4 above above. Except to the extent that the Association and the Union may participate in the selection of their respective trustees, neither the Association, nor the Union nor any Employer shall be responsible for the operation or administration of the Funds. In no event shall the Association, the Union or any employer be liable for any action or failure to act of any trustee. It is agreed and understood that this Section shall serve as a defense to any allegation or course of action brought by any individual or entity which might jeopardize the employer's or other contributor's position that its liability is strictly limited as stated herein.

- 21 -

**Section 6.**    The Union during the term of this Agreement may elect to establish an Annuity Fund to become effective on April 1, 1988.    Contributions made to this Annuity Fund shall be made in lieu of wages and the Fund shall be established in accordance with Article XVI, Sections 2, 3, 4, and 5.

**Section 7.**    In the event that an employer has failed to make the payments required herein for a period of sixty days or more, the Union shall have the discretion to declare this Agreement null and void after giving the Employer and the Association seventy-two hours written notice.

Upon the expiration of the seventy-two hours subsequent notice to the Employer and the Association being served, the Fund's Trustees shall have the discretion to notify the employees of such Employer that this Agreement is null and void and that any work performed by them subsequent to that time may be done at the risk that contributions will not be made or accepted as required by the Agreement.

**Section 8.**    The Union shall not enter into this Agreement with any Employer who has been delinquent in contributions to the Funds or any Fund in the past and who has failed to pay the Funds or any Fund such delinquent contributions, and/or interest, statutory penalty, audit fees, attorney's fees and other expenses of collection.

In the event that a signatory subcontractor of the signatory general contractor on a project does not make a payment of wages, and welfare and pension fund contributions in accordance with the terms of this Agreement, then the union must give the general contractor notice therof within two (2) weeks from the time said wages, health and welfare and pension contributions were due.   The general contractor will then cooperate with the Union in the attempt to help collect the amount due.

ARTICLE XVII

DUES CHECK-OFF

**Section 1.**    Effective May 6, 1987 and continuing thereafter during the term of this Agreement, and in accordance with the terms of an individual and voluntary written authorization for check off of union membership dues to be furnished to the Employer in form permitted by the provisions of Section 302 (c) of the Labor-Management Relations Act, as amended, the Employer agrees to deduct once each week an amount as specified by the Local Union from the gross pay of each employee covered by this Agreement, who signs said authorization as part of the employee's membership dues in the Union.   Said deductions shall be made solely for each employee who is a member of the Local Union and who is working in the geographical jurisdiction of the Local Union as listed in ARTICLE II of this Agreement.

**Section 2.**    The Union agrees to indemnify and save the Employer and the Association harmless against any and all claims, suits, or other forms of liability arising out of the Employers' participation in or performance of the provisions of this Article.   The Union assumes full responsibility for the disposition of the monies so deducted once they have been paid to the Local Union.   The aforementioned authorization shall be in the following form:

- 22 -

<u>CHECK-OFF AUTHORIZATION FORM</u>

<u>FOR</u>

<u>IU AND LOCAL DUES</u>

This is to authorize any of the various  individual Employers who are signatory
to  a  collective  bargaining  agreement  with  BAC Local _____,  the
International Union  or  any BAC affiliate and by whom I may be employed during
the term of such agreement or any renewal, to deduct from my wages and transmit
monthly (accompanied  by  a  statement, reporting the name of each person whose
dues are being paid and the number of hours each has been  paid)  to said Union
(or  to  any agency designated by said Union for the collection of said money),
the sum for each hour paid which  the  Union  has specified, or specifies from
time to time  and so advised my Employer in writing, as the portion of my union
dues to said Union, to its International Union, or to any  other  affiliated of
the International  Union, subject to check-off through procedures conforming to
the Labor-Management Report  and  Disclosure  Act  of 1959.  This authorization
shall be irrevocable for the period of one (1) year following  the  date it was
signed or until the current applicable collective bargaining agreement expires,
whichever  occurs  sooner.  This authorization shall  be  automatically  renewed
from  year  to year,  unless sixty  (60) days prior to the termination of the
annual renewal date I revoke this authorization  by written notice to the Union
and to the individual Employer by whom I am employed.

The Employer shall deduct from the  wages  of  each  employee  who has signed a
check-off  authorization conforming to federal law, and transmit monthly to the
Union (or to any agencies designated  by  said Union for the collection of said
money), the sum for each hour paid which the Union has specified,  or specifies
from time to time and so advised the  Employer  in  writing,  as the portion of
each employees Union dues to said Union, to  its International Union, or to any
other affiliate of the  International  Union,  subject  to check-off.  The sums
transmitted  shall  be  accompanied  by a statement, in a form specified by the
Union,  reporting  the  name of each person whose dues are being paid  and  the
number of hours each employee has been paid.

_____     _____               _____
DATE             EMPLOYEES' SIGNATURE                        SOC. SEC. NO.


                 _____
                 ADDRESS


                 _____      _____      _____
                 CITY OR TOWN              STATE           ZIP


_____     _____
LOCAL UNION NO.          BOOK NUMBER

- 23 -

## ARTICLE XVIII

### BUILDING AND CONSTRUCTION ADVANCEMENT PROGRAM

The Building and Construction Advancement Program Trust Fund (BCAP), a division of The Associated General Contractors of Connecticut, Inc., (hereinafter referred to as the "Fund") has been established and organized to improve public relations; to improve the standards of the construction industry; to conduct education and training programs and to conduct any program for the benefit of the construction industry. The Fund shall not conduct any anti-union or political activity.

The Employer agrees, commencing with the first payroll following the effective date of this Agreement, to make payments of fifteen (15) cents per hour to the BCAP Trust Fund for each hour each employee covered by this Agreement works.

The payment to the Fund shall be made to the BCAP which has been established under an Agreement and Declaration of Trust, the terms of which are hereby accepted by the Employer.

All contributions shall be made at such time and in such manner as the Trustees of the Fund shall require, but in no event shall such contributions be due and payable later than the tenth (10th) day of the month next succeeding the month for which the sum is payable.

If the Employer fails to make contributions to the Fund within the period required by the Trustees of the Fund, at the discretion of the Fund's trustees, the delinquent Employer shall be liable for all reasonable costs for collecting the payments due, including but not limited to reasonable attorney's fees and court costs, audit costs, a reasonable rate of interest on the outstanding balance due the Fund, and liquidated damages assessed by the Fund's Trustees as an "administrative fee" determined as set forth in the Turst Agreement.

The Union shall incur no liability or responsibility for the collection of such contributions.

## ARTICLE XIX

### CONNECTICUT MASONRY INDUSTRY PROMOTION FUND

The Association agrees to establish the Connecticut Masonry Industry Promotion Fund, hereinafter referred to as the Promotion Fund, for the purpose of expanding construction and masonry products markets, engaging in economic research and otherwise improving the outlook for masonry industry employers and employees. The Employer agrees to pay the sum of ten ($.12) cents per hour for each hour worked by covered employees to the Promotion Fund. All administration costs shall be paid from the corpus of the Fund. Two cents ($.02) of the contribution provided herein will be allocated to the International Masonry Institute.

The Association shall appoint five (5) Trustees to administer the Promotion Fund, two (2) of said Trustees to be representatives of masonry contractors, such Trustees having the right and responsibility to operate the Promotion Fund consistent with this Agreement. The Business Agents of respective BAC Local Unions will serve in an advisory capacity to the Trustees.

- 24 -

The Connecticut Masonry Industry Promotion Fund shall at all times conform with the requirements of all federal and state laws and regulations pertaining thereto and shall at all times conform with the requirements of the Internal Revenue Code so that contributions to the Fund shall be treated by the Employer as tax exempt and a deduction for income tax purposes and so that the corpus of the Fund shall be so tax exempt.

### ARTICLE XX

#### MANAGEMENT PREROGATIVES

The Employer hereunder shall have full authority to manage the work, direct the workforce, and decide all matters except to the extent he is specifically prohibited from doing so under this Agreement.

### ARTICLE XXI

#### FOREMAN

**Section 1.**  Foremen shall be practical mechanics in the branch of the trade over which they exercise supervision, and shall have their authority assigned to them by the Employer.

**Section 2.**  Foremen must belong to the International Union of Bricklayers and Allied Craftsmen, but at all times shall be considered the agent of the Employer and shall be recognized as the representative of the Employer.

**Section 3.**  No Foremen shall be allowed to handle tools when there are eight (8) or more journeymen on the job, including himself.

**Section 4.**  Foremen shall be responsible for the layout and construction of all mason work and they shall give all orders to employees covered by this agreement, unless orders are issued directly by the Employer.

### ARTICLE XXII

#### SEVERABILITY

The obligation of the Employers bound by this Agreement shall be several and not joint, and the acts, omissions or violations of this Agreement by an employer or any individual or entity, whether alleged or in fact, shall not be held against any other Employer or against the Association.

- 25 -

## ARTICLE XXIII

### TERM OF AGREEMENT

This Agreement shall remain in full force and effect from May 6, 1987 or the day after expiration of the appropriate predecessor agreement whichever is later, through March 31, 1990 and shall renew itself annually thereafter unless either party shall have given written notice to the other party of its desire to terminate this Agreement and negotiate a successor agreement at least sixty (60) days prior to March 31, 1990 or any March thereafter.

IN WITNESS WHEREOF, the parties hereto have set their hands and have caused this Agreement to be executive by their duly authorized representatives on this 6th day of May, 1987.

LABOR RELATIONS DIVISION, THE
ASSOCIATED GENERAL CONTRACTORS
OF CONNECTICUT, INC.

NORTHERN CONNECTICUT DISTRICT COUNCIL
OF THE INTERNATIONAL UNION OF
BRICKLAYERS AND ALLIED CRAFTSMEN,
AFL-CIO

_____
Local No. 1

Frank Micali
Local No. 2

David Bobbi
Local No. 3

MASON CONTRACTORS ASSOCIATION
OF CONNECTICUT

Local No. 6

Local No. 12

Gene DiGiovanni
Local No. 15

Local No. 16

Local No. 19

Local No. 22

STATE-WIDE PARTICIPATION AGREEMENT
FOR
FRINGE BENEFIT FUNDS

This Agreement provides for fringe benefit fund contributions but does not in any way relieve the Employer of any obligation to enter into collective bargaining agreements with any Participating Local on all matters which are proper subjects for collective bargaining. This Agreement is expressly subordinate to the terms of any collective bargaining agreement to which the Employer is a party, and in the event of any conflict between this Agreement and the terms of any such collective bargaining agreement, the latter shall control.

The undersigned Employer hereby agrees to contribute to the Trust Funds for each hour worked by the Employer's Covered Employees within the territorial jurisdiction of any Local Union participating in such Trust Funds (a Participating Local), or as otherwise provided in the Participating Local's collective bargaining agreement.

"Trust Funds" shall mean the respective jointly managed trust funds providing fringe benefits to which contributions are required under the terms of the collective bargaining agreement to which a Participating Local is a party and applicable to the jurisdiction in which the work is performed.

"Covered Employees" shall mean those employees of the Employer who are performing work in a category of work covered, in the territorial jurisdiction in which the work is performed, by a collective bargaining agreement in effect between a Participating Local and its Historical Employer Bargaining Group.

"Participating Local" shall mean a Local Union, the International Union of Bricklayers and Allied Craftsmen located in Connecticut which has negotiated a collective bargaining agreement with its Historical Employer Bargaining Group providing for employer contributions to the particular Trust Fund and which has been accepted by the Trustees of the Fund as a Participating Local Union.

"Historical Employer Bargaining Group" shall mean the employer association which is recognized by a Participating Local as the bargaining agent for members of the Local Union.

The Employer agrees to participate in the Trust Funds with respect to its Covered Employees and does hereby accept without reservation and agree to be bound by all terms and conditions of the Declaration of Trust of each Trust Fund and the actions of the Trustees thereunder. The Employer agrees that it will make the required contributions at the rates and in the manner prescribed from time to time by the rules and regulations of each Trust Fund and the collective bargaining agreement applicable to the jurisdiction in which the work is performed.

The Employer hereby designates the Labor Relations Division, The Associated General Contractors of Connecticut, Inc., as its representatives with the authority, by mutual agreement, to amend this Agreement in such manner as such representatives shall determine, provided that the Employer shall be furnished with a copy of such amendment and that such amendment shall not alter the Employer's right to terminate this Agreement by written notice as provided in the following sentence. This Agreement shall remain in force until either the Employer or Local Union gives the other written notice of termination, which termination shall be effective on the last day of the calendar month next succeeding the calendar month in which notice is received.

— 2 —

For purposes of this Agreement, the terms Participating Local and Historical Employer Bargaining Group shall include their recognized successors and assigns. This Agreement shall apply to all past contributions made by the Employer to the Trust Funds and such contributions shall be deemed to have been made under this Agreement.

It is understood and agreed that a Participating Local and/or the Trustees of each Trust Fund may take such steps to enforce collection of fringe benefit contributions and to remedy delinquencies as may be set forth in the applicable collective bargaining agreement or the Declaration of Trust for the applicable Trust Fund, as the case may be, or as may be provided under Connecticut law.

The International Union of
Bricklayers and Allied Craftsmen

By _Cintey Mauchette_
  (Officer Duly Authorized)

_13-17 Loc 6_
  (Title)

_3-1-57_
  (Date)

— _Jos Cohn & Son_
  (Name of Employer)

_PO Box 9536_
  (Number and Street)

_N. otoen CT_
  (City and State — Zip)

By _L. Whieu_
  (Officer Duly Authorized)

_____
  (Title)

_____
  (Date)

JOSEPH COHN & SON

TOTAL P.02

Exhibit C

CT9618

# AGREEMENT

RECEIVED JUL 2 9 1996

## BETWEEN

## THE TILE CONTRACTORS ASSOCIATION
## OF
## CONNECTICUT

## AND

## DISTRICT COUNCIL OF CONNECTICUT
## OF THE
## INTERNATIONAL UNION OF BRICKLAYERS
## AND
## ALLIED CRAFTSWORKERS

### June 1, 1996 through March 31, 1999

This is a copy from the IUBAC Document Management System

# TABLE OF CONTENTS

CT 9618

**PAGE NO.**

| | | |
|---|---|---|
| **ARTICLE I** | **RECOGNITION** | 1 |
| **ARTICLE II** | **EQUAL EMPLOYMENT OPPORTUNITY** | 1 |
| **ARTICLE III** | **UNION MEMBERSHIP** | 2 |
| **ARTICLE IV** | **WAGES, HOURS AND WORKING CONDITIONS** | 2 |
| **ARTICLE V** | **HEALTH AND SAFETY STANDARDS** | 6 |
| **ARTICLE VI** | **BUSINESS REPRESENTATIVE** | 7 |
| **ARTICLE VII** | **STEWARDS** | 8 |
| **ARTICLE VIII** | **CRAFT JURISDICTIONS** | 8 |
| **ARTICLE IX** | **CONTRACTING AND SUBCONTRACTING** | 10 |
| **ARTICLE X** | **APPRENTICESHIP** | 11 |
| **ARTICLE XI** | **INSURANCE** | 12 |
| **ARTICLE XII** | **STATE AND FEDERAL LAWS** | 12 |
| **ARTICLE XIII** | **WORK STOPPAGE** | 12 |
| **ARTICLE XIV** | **GRIEVANCES, ARBITRATION** | 13 |
| **ARTICLE XV** | **FRINGE BENEFIT FUNDS** | 13 |
| **ARTICLE XVI** | **DUES CHECKOFF** | 16 |
| **ARTICLE XVII** | **TERM OF AGREEMENT** | 17 |
| **ARTICLE XVIII** | **TRAVELING CONTRACTORS** | 17 |
| **ARTICLE XIX** | **DURATION** | 19 |

CT9618



**WITNESSETH**

**WHEREAS,** the Employer recognizes the Union as the sole collective bargaining agent for all its Employees engaged as the Tile Layers and Finishers, Marble Masons and Finishers and Terrazzo Mosaic Workers and Finishers.

**WHEREAS,** the Parties hereto desire to establish, maintain and regulate the standards of hours of labor, rates of pay and other terms and conditions of employment.

**NOW THEREFORE,** in consideration of the mutual promises, covenants and agreements unto each moving from the other, it is hereby mutually agreed by and between the parties hereto as follows:

## ARTICLE 1
### RECOGNITION

**SECTION 1.** The Employer recognizes the District Council of Connecticut as the sole Bargaining Agent for its members, and the District Council of Connecticut recognizes the Tile Contractors Association of Connecticut as the sole Bargaining Agent for its members and as set forth in the Constitution and Bylaws of the International Union of Bricklayers and Allied Craftsworkers and the Constitution for all such work to be performed within the State of Connecticut.

**SECTION 2.** The Employer agrees that if it has not previously done so, it will, upon the Union's submission of evidence of majority status among its Employees and in the bargaining unit describes herein, voluntarily recognize the Union as the exclusive collective bargaining representative of all Employees within that bargaining unit on all present and future job sites within the jurisdiction of the union. The Employer expressly agrees that it will not condition its recognition upon the results of an election conducted under the rules and regulations of the National Labor Relations Board.

## ARTICLE II
### EQUAL EMPLOYMENT OPPORTUNITY

There shall be no discrimination in the referral, hiring, placement, classification, upgrading, layoff for termination of employment of any individual by reason of age, race, creed, color, sex, national origin, occupational irrelevant physical handicaps or membership or nonmembership in the Union. The Union agrees to support and actively participate in affirmation action programs to promote equal employment opportunity in the construction industry, and the parties hereto agree to the following system to referral of applicants for employment:

1. The Union shall be the sole and exclusive source of referral of applicants for employment.

2. The Employer shall have the right to reject any applicants for employment.

3. The Union shall select and refer applicants without discrimination against such applicants by reason for membership or nonmembership in the Union and such selection and referral shall not be affected in any way by rules, regulations, bylaws, constitution divisions or any other aspect or obligation of referral as to the Union membership policies or requirements. All such selections and referrals shall be in accordance with the following procedure;

-2-

*CT 9618*

4. The Union shall maintain a register of applicants for employment at the office of its Business Manager. If the regulation list is exhausted and the Union is unable to refer applicants for unemployment to the Employers within 24 hours from the time of receiving the Employer's request, the Employer shall be free to secure applicants without using the referral procedure.

5. Together with the aforementioned register of applicants, the Union shall also maintain an "Out Of Work List" which shall list the applicants chronological availability for employment. An applicant who is rejected by an Employer shall be returned to the position which he held on the "Out of Work List" prior to his rejection.

### ARTICLE III
### UNION MEMBERSHIP

1. All Employees who are members of the Union at the time of the signing of this Agreement shall continue membership in the union on of after the (8)eighth day following the beginning of employment, of the date of this Agreement, whatever is later, and must maintain their membership in the union as a condition of employment to the extent of tendering the periodic dues and the initiation fees uniformly required by the Union as a condition of acquiring or maintaining membership therein.

### ARTICLE IV
### WAGES, HOURS AND WORKING CONDITIONS

SECTION 2. The Union shall have the option to divert monies from wages to any of the Funds upon (30)thirty days prior written notification to the Association signatory hereto.

SECTION 3. Money can be diverted back to wages from the Pension, Health and Welfare and Annuity Funds subject to the approval of the Trustees, Trust Document, ERISA, Pension Benefits Guarantee Corporation and applicable laws.

SECTION 4. Should there be a need to increase the rates of contributions payable to the Health provided for in this Agreement, both parties agree to reopen the contract to discuss the increase.

SECTION 5. The regular workweek shall consist of (5)five, (8)eight hour days, Mondays through Fridays, for a total of (40)forty hours. There shall be a 1/2(one-half) hour unpaid lunch between 12:00 noon and 12:30 p.m. If unusual circumstances warrant, as shall be determined by the Employer, the 1/2(one-half) hour lunch period shall be allowed anytime between the hours of 11:30 a.m. and 1:30 p.m.

SECTION 6. The regular staring time shall be 8:00 a.m. or such other times as established by the Employer between 7:00 a.m. and 9:00 a.m. Any employee who is transferred to another job because of weather shall not displace any Employee working on that job to which he is transferred.
When a job is unable to start before 10:00 a.m., no work is to be performed that day, unless the foreman shall specify a definite starting time. Employees ordered to stay on the job shall be paid from 10:00 a.m. This provision is based on an 8:00 a.m. to 4:30 p.m. workday. In the event the working hours become 7:00 to 3:30 p.m., substitute "9:00 a.m." for "10:00 a.m."

-3-

## TILE, MARBLE & TERRAZZO WORKERS
## LOCAL #65 CT.

### (Classifications, Effective Dates & Wage Rates)

[CHECKOFF TOTAL: 3 1/4% OF THE TOTAL PACKAGE]     *CT 9618*

*BØ*

## MECHANICS:
**DUES CHECKOFF**   6/3/96 - $0.98    4/1/97 - $1.00     4/1/98 - $1.02

| Effective Date: | WAGES | IHF | IPF | IRSP | IMI | TOTAL |
|---|---|---|---|---|---|---|
| 6/3/96 | $22.00 | 4.00 | 2.80 | 1.00 | 0.40 | $30.20 |
| 4/1/97 | $22.45 | 4.00 | 2.80 | 1.00 | 0.50 | $30.75 |
| 4/1/98 | $22.95 | 4.00 | 2.80 | 1.00 | 0.60 | $31.35 |

## TERRAZZO FINISHERS:
**DUES CHECKOFF**   6/1/96 - $0.86    4/1/97 - $0.87     4/1/98 - $0.89

| | | | | | | |
|---|---|---|---|---|---|---|
| 6/3/96 | $18.75 | 4.00 | 1.50 | 1.90 | 0.20 | $26.35 |
| 4/1/97 | $19.25 | 4.00 | 1.50 | 1.90 | 0.20 | $26.85 |
| 4/1/98 | $19.75 | 4.00 | 1.50 | 1.90 | 0.20 | $27.35 |

## TILE & MARBLE FINISHERS:
**DUES CHECKOFF**   6/1/96 - $0.76     10/1/96 - $0.77    4/1/97 - $0.78
                    10/1/97 - $0.79            4/1/98 - $0.80    10/1/98 - $0.82

| | | | | | | |
|---|---|---|---|---|---|---|
| 6/3/96 | $16.90 | 4.00 | 0.50 | 1.75 | 0.20 | $23.35 |
| 10/1/96 | $16.90 | 4.00 | 0.70 | 1.75 | 0.20 | $23.55 |
| 4/1/97 | $17.40 | 4.00 | 0.70 | 1.75 | 0.20 | $24.05 |
| 10/1/97 | $17.40 | 4.00 | 0.90 | 1.75 | 0.20 | $24.25 |
| 4/1/98 | $17.80 | 4.00 | 1.00 | 1.75 | 0.20 | $24.75 |
| 10/1/98 | $17.80 | 4.00 | 1.50 | 1.75 | 0.20 | $25.25 |

## CODES/ABBREVIATIONS

IHF   - INTERNATIONAL HEALTH FUND
IPF   - INTERNATIONAL PENSION FUND
IRSP  - INTERNATIONAL RETIREMENT SAVINGS PLAN
IMI   - INTERNATIONAL MASONRY INSTITUTE

**PLEASE NOTE:** Expiration date: "March 31, 1999"

CT9618

**SECTION 7.** Employees shall be paid the overtime rate of one and one-half times the regular straight time hourly rate of pay for all time worked in excess of eight hours per day and for forty hours per week and for Saturdays. Employees shall be paid the overtime rate of two times the regular straight time hourly rate of pay for all time worked on Sundays and holidays. There shall be no pyramiding of overtime.

**SECTION 8.** On projects subject to limitations or restrictions by government agencies, railroads, utilities and private owners as to when work may be performed, the Employer may schedule work in accordance with these limitations or restrictions and all work will be paid for solely at the regular straight time rate of pay, regardless of the time of day or the day of the week that the work is performed, except that time and one-half the regular rate of pay will be paid for all hours of work over (40) in a week.

**SECTION 9. (SATURDAY MAKE-UP DAY)** On any given project, Saturday may be worked at the straight time rate of pay if work is not performed on a day during that week because of a holiday or inclement weather, provided that an employee may not be discriminated against for not working on such a Saturday and that work on Saturday is scheduled for (8)eight hours.

**SECTION 10.** The Employer shall establish one day each week, Monday through Thursday, as the Employer payday for its employees. If a regular payday falls on a holiday, recognized in Section 5 hereof, employees shall be paid before quitting time on the regular work day immediately preceding the holiday, where practical.

The Employer shall pay employees by cash or check and shall accompany each payment with an itemized written statement setting forth the payroll period, the gross pay for said period, the hours worked and an itemized list of deductions from the employee's gross pay. Failure of the Employer's bank to honor payroll checks because of insufficient funds may cause the Union to require the Employer to pay in cash on each regular payday.

**SECTION 11.** There shall be only one scale of journeyman's wages and the highest scale shall prevail. When the Employer violates this Agreement concerning the scale of wages by paying a higher rate of pay, he shall be obligated to pay the higher rate of pay to all journeyman and finishers employed on the job. The higher wage rate shall continue in effect until the completion of the job and in no event shall a rate of wage so established be reduced on that job.

**SECTION 12. (HOLIDAYS)** Recognized holidays, without pay, shall be New Year's Day, Good Friday, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day. Under no circumstances shall work be scheduled for Labor Day, except in cases of extreme emergency involving life or property. In the event any of the above holidays fall on a Sunday, it will be observed on the following Monday.

**SECTION 13.** Any employee requested to report to work by an Employer or his Representative, who is not put to work after bringing his tools to work on the job, shall receive (2)two hour's pay provide the employee is not prevented from working by conditions caused by adverse weather or other conditions beyond the control of the Employer, in which

-5-                              CT9618

event the employees shall be signed in and put to work on the next day when there is work available, weather permitting.

SECTION 14. Any employee or employees who have worked for at least (2)two hours and subsequently laid off for lack of work during the regular working hours shall be paid for (8)eight hours but shall not receive pay for that day beyond the hours already worked, if the job is stopped by the architect or for unsafe conditions.

SECTION 15. Any Employer, coming from outside of the Union's jurisdiction, shall notify the Union at least (24 Hours) before he starts work, that he will engage employees, and pay said employee's wages, provided herein, in the full job at the rate provided for in whichever is higher. The Employer can provide "One, Lead Mechanic and One, Lead Finisher," all other employees shall be members of Local 65.

SECTION 16. (TRANSPORTATION) Employees shall provide transportation to and from the job in a property insured company vehicle. Employees have the right to refuse transportation in a company vehicle if the vehicle fails to meet safety requirements as set by the Connecticut Department of Motor Vehicles. If the Employer requests that the employees use their own vehicles to the job, they shall be paid travel time. Travel shall be paid by the rates listed by towns:

ZONE 1: "NO REIMBURSEMENT"
Ansonia, Beacon Falls, Bethany, Berlin, Bloomfield, Branford, Bridgeport, Bristol, Cheshire, Clinton, Cromwell, Derby, Durham, East Hartford, East Haven, Easton, Farmington, Fairfield, Glastonbury, Guilford, Haddam, Hartford, Killingworth, Madison, Manchester, Meriden, Middlefield, Middletown, Milford, Monroe, Naugatuck, New Britain, New Haven, Newington, North Branford, North Haven, Orange, Oxford, Plainfield, Portland, Prospect, Rocky Hill, Seymour, Shelton, Southington, South Windsor, Stratford, Trumbull, Wallingford, Waterbury, Westbrook, West Hartford, West Haven, Westport, Weston, Wethersfield, Wolcott, Woodbridge, Chester, Darien, Deep River, East Haddam, East Hampton, Essex, Lyme, Newtown, Norwalk, New Canaan, Old Lyme, Old Saybrook, Redding, Wilton, Avon, Bethel, East Lyme, East Windsor, Hebron, Marlborough, New London, Salem, Stamford, Southbury, Vernon, Windsor, Windsor Locks, Bolton, Hamden and Middlebury.

ZONE 2: "$5.00 PER DAY"
Andover, Bozrah, Bridgewater, Brookfield, Burlington, Colechester, Columbia, Coventry, Danbury, East Granby, Ellington, Enfield, Greenwich, Groton, Lebanon, Ledyard, Montville, New Milford, Norwich, North Stonington, Plymouth, Preston, Ridgefield, Roxbury, Simsbury, Somers, Stonington, Suffield, Tolland, Waterford, Watertown, Woodbury and New Fairfield.

ZONE 3: "$8.00 PER DAY"
Ashford, Bethlehem, Canton, Chaplin, Franklin, Granby, Griswold, Harwinton, Lisbon, Mansfield, Morris, New Hartford, Sprague, Stafford, Thomaston, Voluntown, Washington, Willington and Windham.

-8-

CT9618

## ZONE 4: "$10.00 PER DAY"

Barkhamsted, Canterbury, Colebrook, Eastford, Hampton, Hartland, Kent, Litchfield, Plainfield, Scotland, Sherman, Sterling, Torrington, Union, Warren, Winchester, Brooklyn, Canaan, Pomfret, Putnnam, Sharon, Thompson, Woodstock, Cornwall, Goshen, Killingly, Norfolk, North Canaan and Salisbury.

**SECTION 17. "SHIFT PROVISION"** Shift work may be permitted under the following conditions:

(a) Where a job has more than (1)one (8)eight hour shift in any (1)one (24)twenty-four hour period, employees will not be permitted to work more than (1)one shift in any (1)one work day.

(b) All employees on shift work shall receive a full normal work day's pay.

(c) (7 1/2)Seven and one-half hour's work shall constitute the shift during the second shift and (7)seven hours work during the third shift.

(d) Where no third shift exists, time worked beyond the end of the second shift shall be paid at the overtime rate.

(e) No shift work will be permitted for less than (3)three consecutive work days.

(f) Shift conditions and wages shall apply to alteration work in occupied areas without the requirement that work be performed during the regular work day, provided a written shift permit is issued by the Union.

(g) When an Employer wishes to work employees for the second or third shift periods, he shall notify the Union in writing within (24)twenty-four hours prior to the shift so that proper arrangement shall be made.

**SECTION 18. (GRINDING)** Terrazzo Finishers engaged in the use of terrazzo grinding shall be paid $1.00 over the scale. The rate shall be for the full working day.

**SECTION 19. (MORNING BREAK)** A coffee/refreshment break of not to exceed (10)ten minutes shall be allowed every morning, with the understanding that either/and apprentice or a finisher shall be allowed to get the refreshments and the other employees shall not leave their assigned work station. The break shall begin when the refreshments are received by the employees.

## ARTICLE V
## HEALTH AND SAFETY STANDARDS

SECTION 1. The Employer, the Union and the employees shall abide by the provisions contained in the Federal Williams-Steiger Occupational Safety and Health Act and the Connecticut Safety Construction Act.

SECTION 2. Employees shall abide by all safety regulations promulgated by the Employer, and an employee shall report to the Employer every injury which he incurs in the course of employment on the day such injury occurs.

CT9618

-7-

**SECTION 3.** When using machines in the performance of work, men and machines shall be properly guarded to prevent possible injuries, all safety devices to be supplied by the Contractor, and no safety devices be removed from such machine.

**SECTION 4.** No employee shall be required to work where he is subject to excessive dust or grift caused by cutting or grinding. This does not pertain to the operator who shall be adequately protected.

**SECTION 5. (DRUG TESTING)** In an effort to enhance the safety of the work place, testing of employees and applicants for drug, alcohol or other substance impairment may be required by the owner or Employer. The testing program shall be performed by recognized physicians and/or laboratories and shall comply with any and all federal state and local standards. The cost of such programs shall be born by the Employer. When testing is required by the Employer, the employee shall be paid for the time necessary to take the test provided that the results of the employee's test are negative. No time shall be paid to any employee whose test results are positive.

Nothing herein, shall be construed to impose any obligation, duty or responsibility upon the Union or its duly authorized representative to test employees for drug, alcohol or illegal substance.

The Employer shall indemnify and hold harmless the Union, its Officers, Agents, Employees and Representatives from and against any and all loss, suits, actions or claims of any character by any employee or group of employees covered under this Agreement arising from the drug, alcohol or substance impairment testing practices set forth in this Article. Except that the Employer shall not be held responsible in any manner for loss, suits, actions or claims of any character in the event the Union, knowingly refers the employees to the Employer, who are under the influence of drugs, alcohol or other illegal substance.

Knowingly as used herein, shall not mean inferred knowledge, but shall rather mean that the referring Agent or Representative of the Union actually knew that the employee in question was under the influence of drugs, alcohol or other illegal substance at the time of the subjects referral.

## ARTICLE VI
### DIRECTOR AND FIELD REPRESENTATIVES

**SECTION 1.** All Contractors starting work covered by this Agreement shall notify the District Council Director, (5)five working days before the work is to commence.

**SECTION 2.** The Director and/or Field Representatives may visit any building on the construction. If the Director and/or Field Representatives are barred form any job by the Employer while in the performance of their duties, the Union shall have the right not to permit its members not to work on the job.

If there is a location designated by the general contractor or construction manager for the visitors to sign in on the project, the Director and/or Field Representatives must sign in prior to any work area.

CT9618

SECTION 3. The Director or Field Representative may inspect any working member's pay stub or envelope during the job.

## ARTICLE VII
### STEWARDS

SECTION 1. The first Journeyman to start work on any job shall act as shop steward until he or some other member duly appointed by the Director or Field Representative from among the Employer's employees working on that particular job. There shall be no working shop steward.

SECTION 2. Any employee appointed by the Union's Director or Field Representative to serve as shop steward must be able to speak and read the English language, to perform the work available to the branch of the trade to which he is assigned. His authority however, is recognized as subordinate to that of the Director and/or Field Representative.

SECTION 3. The steward shall be allowed reasonable amount of time during normal working hours without loss of pay to perform the following functions:

(a.) Adjust all grievances and complaints in accordance with his role under the Grievance Procedures and if he is unable to do so, he shall be permitted to call the Director or Field Representative.

(b.) Examine the due's books of employees on the job.

(c.) See that the Employer furnishes drinking water in a covered vessel with individual drinking cups and that the proper toilet facilities are provided.

SECTION 4. The Employer shall be responsible for the loss of tools after working hours as a result of fire or breaking and entering of the building, up to ($100.00)one-hundred dollars per man, providing the employee, before starting work on the project, furnishes the Employer a written inventory of his tools and the replacement cost, thereof, verified by a Representative of the Employer.

SECTION 5. The steward shall remain at work so long as any employee in the branch of the trade in which the steward is working remains at work until the completion of work, provide he is qualified to perform the available work. When workers are laid off before the job is complete, for reasons beyond the Contractor's control, the stewards shall have the first preference of being called back when the job starts up again. "Punch list not included."

SECTION 6. There shall be no interference with the steward in his reasonable performance of the duties set forth herein. The steward shall not be discharged or discriminated against for his proper performance of his duty set forth herein.

SECTION 7. All Employers shall call the Local Union when the job starts.

## ARTICLE VIII
### CRAFT JURISDICTION

SECTION 1. The Employer acknowledges that the Union claims items of work listed in the

CT9618

Bricklayers and Allied Craftsworkers International Union Constitution and Rules of Order as set forth below, to be within its work jurisdiction. In making work assignments, the Employer shall consider area and trade practice, work ordinarily and customarily performed by employees covered by this Agreement and Work Jurisdiction Agreements between International Unions.

(a.) Tile Layers Work - The laying or setting of all tile where used for floors, walls, ceilings, walks, promenade roofs, stair threads, stair risers, facings, fireplaces and decorative inset together with any marble plinths, thresholds or window stools used in connection with tile work, also to prepare and set all concrete, cement brick work or other foundations or setting or bedding of all tile, stone marble, composition, glass, mosaic or other materials forming the facing, hearth or fireplace of a mantle, or the mantle complete together with the setting of all cement, brickwork or other materials required in connection with the above work, also the slab and fabrication of tile mantles, counters and tile panels of every description and the erection and installation of the same. The building, shaping, forming construction or repairing of all fireplace work, whether in connection with a mantle, hearth facing or not, and the setting and preparing of all materials; such as cement, plaster, mortar, brickwork, ironwork or other materials necessary for the proper and safe construction and completion of such work, except that a mantle made exclusively of brick, marble or stone shall be considered to be bricklayers, marble mason work respectively. It will be understood that the word "tile" refers to all burnt clay products, as used in the industry, either glazed or unglazed and to all composition matter made in single units up to 15" x 20" x 2" except quarry tile larger than 9" x 9" x 1-1/2", also to mixtures in tile form of cement, plastics and metals that are made for and intended for use as finished floor surface, whether upon interior floors or exterior floors, stair threads, promenade roofs, garden walls, interior or exterior floors, swimming pools and all places where tile may be used to form a finished surface for practical use, sanitary finishes or decorative purposes or inserts in other material.

(b.) Tile Finishers - shall mix all mortar, do all cleaning, washing and grouting of all tile installed by the tile layer or similar workmen, handle all sand, cement, tile and any and all material that may be used by the tile layer after being delivered on the job, and there shall be (1)one finisher to each tile layer on the job, as in the custom of the trade. Where conditions require a lesser ratio than one for one, the amount of finishers on the job shall be determined by the Business Representative of Local 65 and/or the Director of the District Council and the Contractor involved. On all mortar jobs (walls and floors) there shall be at least one finisher for every tile layer and the finisher shall not be required to help more than one tile layer.

(c.) Marble Masonry - Marble Mason's jurisdiction claims consist of the carving, cutting and setting of all marble, slate(including slate backboards), stone, albereen carrara, sanioyx, vitrolite and similar opaque glass, scagliola, marleithic and all artificial imitation or cast of whatever thickness or dimension. This shall apply to all interior work, such as; sanitary, decorative and other purposes inside of buildings of every description wherever required, including all polished bone or sand finished also the cutting and fitting of above materials after same leave mills or shop and the laying of

*LT9618*

-10-

all marble tile, slate and terrazzo tile.

(d.) Marble Finishers - shall mix all mortar, do all cleaning, washing/grouting and pointing up of all marble installed by the marble mason. There shall be (1)one marble finisher to each marble mason on the job as the custom of the trade, or where conditions require a lesser ratio than one to one, the amount of finishers on the job shall be determined by the Business Representative of Local 65 and/or the Director and the Contractor involved.

(e.) Marble, Mosaic and Terrazzo Work - Marble Mosaic, Venetian Enamel and Terrazzo. Cutting and assembly of all Mosaic. The casting of all Terrazzo in shops and/or on the jobs. All scratch coat on walls and ceilings where Mosaic and Terrazzo is to be applied, shall be the work of the Mosaic and Terrazzo workers. All bedding, laying or setting of metal, composition or wooded strips and ground and the laying and cutting of metal, strips, lath or other reinforcement, where used in Mosaic and Terrazzo work shall be the work of the Mosaic and Terrazzo worker. All Cement Terrazzo, Magnetite Terrazzo, Dex-O-Tex, Rustic or Rough Washed for interior or exterior of building and as other kinds of plastic mixtures composed of chips of marble granite, blue stone, enamel, mother of pearl and all other kind of chips when mixed with cement, rubber, magnesium, chloride or other binding materials when used on floors, ceilings, stairs, saddles or any part of interior or exterior of buildings and also other work no considered part of a building, such as fountains, swimming pools, etc...also other substitutes that may be applied under the same method as Mosaic and Terrazzo. Cutting and assembling of art ceramic and glass mosaic comes under the jurisdiction of the Mosaic workers and the setting of same shall be done by the Tile Layers.

(f.) Terrazzo Finishers/Grinders - shall do all the handling of sand, cement, lyme, terrazzo chips and all other materials that may be used by the Mosaic of Terrazzo Mechanic. Finishers shall do all the rubbing, grinding, cleaning by hand or machine or other work as is required in the handling of a Terrazzo Mechanic. There shall be (1)one Terrazzo Finisher to each Terrazzo Mechanic on the job as in the custom of the trade, or where conditions require a lesser ratio than one to one, the amount of Finishers on the job shall be determined by the Filed Representative of Local 65 and/or Director of the District Council and Contractor involved.

## ARTICLE IX
## CONTRACTING AND SUBCONTRACTING

SECTION 1. It is agreed that if the work is sublet or subcontracted by the Employer, it shall be given to a Contractor who agrees to be bound by the terms of this Agreement. There shall be no lumping of work.

SECTION 2. No employee shall contract by the Unit, or lump work of any character, covered by our classification of work, or work for any person or persons contracting work by the unit, or lump work of any character, taken from general contractors without furnishing material and the permission from the Director and/or the Executive Board of the District Council of Connecticut.

CT 9618

-11-

SECTION 3. The Employer agrees not to sublet, assign or transfer any work covered by this Agreement to be performed at the site of a construction project, to any person, firm or corporation, except where a subcontractor subscribes to and agrees in writing to be bound by the full term of this Agreement and complies with all the terms and conditions of this Agreement.

SECTION 4. All charges of violations of this Article shall be considered as a dispute and shall be processed in accordance with the provisions of this Agreement covering the procedures for the handling of disputes and the final and binding arbitration of disputes.

## ARTICLE X
### INTERNATIONAL MASONRY INSTITUTE TRUST
### AND
### IMI APPRENTICESHIP TRUST

SECTION 1. Each Employer signatory hereto subscribes and agrees to be bound by the Agreement and Declaration of Trust of the International Masonry Institute(IMI) including the International Masonry Institute Apprenticeship Trust(IMI/AT).

SECTION 2. Each Employer agrees to pay said Funds the amount set forth in Article IV of this Agreement for each hour worked by each employee including apprentices, covered by this Agreement. Payment shall be reported and paid not sooner than the twenty-fifth day of the month following the month in which the work was performed along with other contributions as provided in this Agreement.

SECTION 3. Failure to contribute to the Fund shall be a violation of this Agreement.

SECTION 4. Each Employer shall be required to employ a ratio of (1)one to (7)seven Journeymen on a job when Apprentices are available. When appropriate, a ratio of (1)one Apprentice to (3)three Journeymen may be employed.

The following percentage of Journeyman wage rates shall be paid to Apprentices and the following fringe benefit contributions shall be made for hours worked by Apprentices:

1st 750 Hours 50% of Journeyman wage rate
2nd 750 Hours 55% of Journeyman wage rate

Employees shall contribute to all the Funds for which contributions are required by the Agreement, except the Pension Fund and the Annuity Fund for the first 1500 Apprentice Hours.

3rd 750 Hours 60% of Journeyman wage rate
4th 750 Hours 70% of Journeyman wage rate

Employers shall contribute to all the Funds to which contributions are required by the Agreement, except the Annuity Fund for the next 1500 Apprentice Hours.

-12-

*CT9618*

5th 750 Hours 80% of Journeyman wage rate
6th 750 Hours 90% of Journeyman wage rate

Employers shall be required to contribute to all the Funds to which contributions are required by the terms of this Agreement for the last 1500 Apprentice Hours.

SECTION 5. All parties of this Agreement shall adhere to the Apprenticeship rules and regulations and standards provided by IMI and the Connecticut State Apprenticeship Council. IMI shall register the training program and all Apprentices under the supervision of IMI with the Connecticut State Apprenticeship Council and secure certification of the Apprenticeship Program so that payment of Apprentice wage rate and fringe contribution rate will be permitted under state and federal prevailing rate laws. Contributions to the Apprenticeship Fund shall not be required during any period that payment of Apprentice wage rate and fringe contribution rate are not permitted under state and federal prevailing rate laws.

SECTION 6. The Committee shall cooperate with the Bureau of Apprenticeship, United States Department of Labor, Connecticut State Apprenticeship Council, Connecticut State Agencies and Trade Related Industries in advancing the training skills of Apprentices.

## ARTICLE XI
### INSURANCE

The Employer shall carry on behalf of all employees covered under this Agreement, Worker's Compensation Insurance through a carrier's licensed to do business in the State of Connecticut and shall make Unemployment Compensation payments as required by law. The Employer shall provide the Director or Field Representative of the Union with evidence of such coverage upon request.

## ARTICLE XII
### STATE AND FEDERAL LAWS

It is assumed by the parties hereto that each provision of this Agreement is in the conformity with all applicable laws of the United States and State of Connecticut. Should it later be determined that it would be a violation of any legal effective government or state order or statutes to comply with any provision or provisions of this Agreement, the parties hereto agree to negotiate such provision or provisions of this Agreement for the purpose of making them conform to such laws or statutes so long as they shall remain effective and the other provisions of this Agreement shall not be effected thereby.

## ARTICLE XIII
### WORK STOPPAGE

SECTION 1. It is agreed that there shall be no work stoppage during the term of this Agreement except for the following causes only and only (48)forty-eight hours (weekends excluded) after notice from the Union has been received by the Employer and the Association which clearly states the union's intentions to strike for:

"Willful nonpayment of wages and/or fringe benefit contribution as required by this Agreement for time actually worked by employees covered under this Agreement."

CT9618

The notice required by this Section shall be by telegram, registered or certified mail and shall be authorized and signed by the Director of the union.

**SECTION 2.** Any employee(s) who lost wages when this Article XIII is implemented, due to the Employer's failure to pay wages and/or fringe benefit contribution as provided in this Agreement, shall be compensated for each hour lost up to (2)two work days, (16)sixteen hours.

**SECTION 3.** Except as specifically provided in Section 1 above, there shall be no work stoppage, strikes, slow-downs or other interference with the progress with the work during the terms of this Agreement.

## ARTICLE XIV
### GRIEVANCES, ARBITRATION

**SECTION 1.** Any disputes which may arise with respect to the application and interpretation of this Agreement shall be taken up by the employee and the steward with the foreman. If it is not settled to the satisfaction of the employee and the steward, the Director and/or Field Representative shall be called immediately after the foreman gives his final decision. All disputes shall be handled on the day presented to the foreman or the next working day at the latest.

**SECTION 2.** If the dispute is not settled on the job, it shall be referred to a Standing Arbitration Committee of (4)four members, (2)two of whom shall be Employers selected by Employers who have signed Agreements with the Union, and (2)two of whom shall be selected by the Union. Such Committee shall meet to consider to dispute within (3)three days after the notice at a time and place designated in the notice which shall be in writing. No person interested in the outcome of the dispute personally, shall be permitted to sit on the Committee. Its decision shall be final and binding.

**SECTION 3.** If either party involved in the dispute shall fail to appear before the Committee after receiving notice in writing of its meeting to consider the dispute, the Committee shall proceed to hear that dispute and render its decision which shall be final and binding. If the dispute is not settled satisfactorily by the Standing Arbitration Committee, that is, if there is no majority vote on the dispute within five days after the final hearing, the parties shall refer the matter to the Federal Mediation and Conciliation Service whose decision shall be final and binding. The cost of Arbitration meetings shall be paid by the party found in violation of this Agreement.

## ARTICLE XV
### HEALTH, WELFARE, PENSION AND ANNUITY FUNDS

**SECTION 1.** The parties hereto jointly agree to accept and be bound by the provisions of the written Agreement and Declaration of Trust and any amendments thereto, provided it does not conflict with the Collective Bargaining Agreement and/or provided the Collective Bargaining Agreement does not conflict with any federal law or Department of labor and IRS regulations applicable to fringe benefit funds and provided written notification by certified mail has been given, within (60)sixty days of such amendment becoming effective to the District Council and the Associations having territorial jurisdiction, both of whom are parties

CT9618

-14-

to the Trust Agreement of the various Health and Welfare, Pension and Annuity Funds, hereinafter covered by this Agreement, which are:

International Health Fund
International Union Pension Fund
International Retirement Savings Plan (Annuity Fund)
International Masonry Institute

**SECTION 1.** Each Employer agrees to pay the Funds listed, the required contribution rates for all hours worked by employees and apprentices, except only as specifically agreed above with respect to the first 3000 hours of apprentice training. An hour of work for which overtime or any other premium wage must be paid, shall be considered a single hour for this purpose.

**SECTION 2.** Not later than the 20th day following the month in which the hours of work were performed, each Employer shall submit to the Funds reports containing a complete list of names of employees, social security numbers and the number of hours worked by each employee during the previous month. In the event no employee worked during the previous month, the Employer shall submit a report attesting that no employees worked and this will be the Employer's final report until the Employer has reportable hours in the future.

**SECTION 3.** If an Employer fails to make the required contributions to any Fund by the end of the month following the month in which the work was performed, the Employer shall be considered a delinquent Employer for that Fund.

If so determined by the Trustees of any Fund, Delinquent Employers shall pay to each Fund for which it is a delinquent Employer interest charges at the rate of one and one-half percent computed on the entire sum owed each Fund for each (30)thirty day period or fraction thereof that is a delinquent Employer.

If so determined by the Trustees of any Fund, since the failure of a delinquent Employer to remit timely payment of contributions imposes additional accounting, handling and administrative expenses upon each of the Funds, each delinquent Employer shall pay as liquidated damages, the sum of ($1.00) per employee per Fund, up to a total maximum payment of ($3.00) per employee, for each (30)thirty day period or fraction thereof that the Employer is Delinquent.

If so determined by the Trustees of any Fund, an Employer whose check is returned for insufficient funds will be required to make payments by certified check for the next (6) months.

**SECTION 4.** The failure of any Employer to make the required reports and contributions to each Fund shall make the Employer liable: (1) to each Employer damaged by such failure for whatever benefits the employee and his/her beneficiaries were denied because of the Employer's failure to make the required reports and contributions and (2) for court costs and attorney's fees reasonably necessary in collecting the contributions, provided however, that no Employer shall have any liability to any employee or beneficiary as set forth above, if the failure to pay the required contribution or any part thereof was the result of honest mistake



**15**

or inadvertence.

CT 9618

**SECTION 5.** No combination of Employer contributions to the pension and annuity funds shall exceed 25% of the hourly wage rate during the terms of this Agreement. However, if the present 25% restriction is ultimately adjusted or lifted by the IRS during the term of this Agreement, the negotiating parties will adjust or waive this clause accordingly.

**SECTION 6.** All fringe benefit funds to which Employer contributions are required by this Agreement shall be maintained at all times as jointly administered Taft-Hartly Trust Funds with an equal Employer with Employer Trustees and Labor Trustees, herein referred to as the "Trustees", with such powers and duties as may be provided for from time to time by the applicable Trust Agreement. The Funds shall furnish to the Association and the union copies of their respective annual audit reports and annual actuarial or consulting reports and information concerning contributions received or due as might be requested from time to time.

**SECTION 7.** The Funds shall at all times be operated in conformance with applicable Federal and State laws and regulations and shall be maintained as tax exempt trusts under provisions of International Revenue Code and Employer contributions to said Fund shall at all times be deductible by the Employer for Federal Income Tax purposes. In the event that a Fund fails to retain approval as a tax exempt Trust so that the Employer contributions shall not be deductible as a business expense, the Employer shall not be liable to contribute to such Fund for hors worked during the period that the contribution is not deductible.

**SECTION 8.** At the decision of the Fund's Trustees, an Employer determined to be delinquent in its payments as required herein may be held liable for all contributions due to the Fund and reasonable attorney's fees, court costs, audit fees and other expenses incurred incidental to collection of contributions due the Fund, including a reasonable rate of interest on contributions due. Appropriate payroll records of the Employer may be subject to audit by the Trustees of their authorized representative upon reasonable notice. The Trustees shall have all powers with respect to the audit of payroll records and the collection of delinquent contributions, interest, audit fees, attorney's fees and other expenses of collection as may be provided from time to time by the applicable Trust Agreement.

**SECTION 9.** Nothing in this Agreement, any Trust Agreement for a Fund to which contributions are required by this Agreement, a plan of benefits or any other documents shall be construed to impose upon the Employer or other contributor any liability or obligation to contribute or make any other payments to any Fund toward the cost of benefits or the cost of administration or funding to the plan beyond the obligation of Employer to make contributions, provide any required bonding and pay the expenses of collection specified in this Agreement. Except to the intent that the Association and the Union may participate in the selection of their respective Trustees, neither the Association nor the union nor any Employer shall be responsible for the operation or administration of the Funds. In no event shall the Association, the union or any Employer be liable for any action or failure to act of any Trustee. It is agreed and understood that this Section shall serve as a defense to any allegation or course of action wrought by any individual or entity which might jeopardize the Employer's or other contributor's position that its liability is strictly limited as stated herein.

-16-

CT9618

In no event shall the Employer be liable to make duplicate contributions to more than (1)one Fund providing the same type of benefits.

## ARTICLE XVI
## DUES CHECKOFF

**SECTION 1.** Effective and continuing during the term of this Agreement and in accordance with the terms of an individual and voluntary written authorization for checkoff of union membership dues to be furnished to the Employer in a form as specified in Section 3. below, and permitted by law including the provisions of Section 302(c) of the Labor Management Relations Act, as amended, the Employer agrees to deduct once each week from the net pay of each employee covered by this Agreement, who signs said authorization, the sum which the union has specified, or from time to time later specified, in writing to the Employer as the dues for the Union and its international union for each payroll hour worked by said employee during the week as part of the employee's membership dues in the Union, provided however, that no change in the amount of hourly dues shall take effect until after the Union shall have given the Association (30)thirty days prior written notice thereof. Said deductions shall be made solely for each employee who is a member of the Local union and who is working in the geographical jurisdiction of the District Council.

**SECTION 2.** The Union agrees to indemnify and save the Employer and the Association harmless against any and all claims, suits or other forms of liability arising out of the Employers' participation in or performance of the provisions of this Article. The Union assumes full responsibility.

**SECTION 3.**

## COMBINED WORKING DUES AND BACPAC CHECK-OFF AUTHORIZATION

☐ I hereby authorize any of the various individual Employers who are signatory to a collective bargaining agreement with any Bricklayers & Allied Craftsmen Local Union, District Council, the International Union, or any other BAC affiliate, and by whom I may be employed during the term of such agreement, or any renewal or extension, or any subsequent agreement, to deduct from my wages and transmit monthly to said Union the sum which the Union has specified, or specifies from time to time, as the portion of my union dues to said Union, to the International Union, or to any other BAC affiliate, subject to check-off through procedures conforming to applicable law. This authorization shall be irrevocable for a period of one (1) year following the date it was signed or until the current applicable collective bargaining agreement expires, whichever occurs sooner. This authorization shall be automatically renewed from year to year, unless sixty (60) days prior to the termination or the annual renewal date I revoke the authorization by written notice to the Union and to the individual employer by whom I am employed.

☐ I also hereby authorize the Employer (as described above) to deduct from my wages the sum of _____ for each hour paid and to transmit that amount in the manner prescribed by the Union to the Bricklayers & Allied Craftsmen Political Action Committee (BACPAC). This authorization is signed freely and voluntarily and not out of fear of reprisal, and on the understanding that BACPAC is engaged in a joint fund raising effort with the Committee on Political Education of the American Federation of Labor & Congress of Industrial Organizations, that BACPAC will use the money contributed to that effort to make political contributions and expenditures in connection with federal, state and local elections, and that this voluntary authorization may be revoked at any time by written notice to the Employer and BACPAC of a desire to do so.

• To authorize the deduction of both working dues and BACPAC contribution, please sign and date this form.

• To limit the authorization to the deduction of either the working dues or BACPAC contribution, please check the appropriate box, sign and date this form.

Date _____ 19 ____  Signature _____

Social Security No. _____

CT 9618

-17-

## ARTICLE XVII
## PRESERVATION OF WORK

**SECTION A.** In order to protect and preserve, for the employees covered by this Agreement, all work heretofore performed by them in order to prevent any device or subterfuge to avoid the protection and preservation of such work, it is hereby agreed as follows: If and when the Employer shall perform any work of the type covered by this Agreement at the site of a construction project, under its own name or under the name of another, as a corporation, company, partnership or any other business entity, including a joint venture, wherein the Employer (including its officers, director, owners, partners or stockholders) exercises either directly or indirectly (such as through family members) any significant degree of ownership, management or control, the terms and conditions of this Agreement shall be applicable to all such work.

**SECTION B.** All charges of violations of Section A of this Article shall be considered as a dispute under this Agreement and shall be processed in accordance with the procedures for the handling of grievances and final binding resolution of disputes, as provided in Article XIV of this Agreement. As a remedy for violations of this Section, the arbitrator (or arbitration body) provided for in this Article XIV is empowered, at the request of the Union, to require an Employer to (1.) pay to affected employees covered by this Agreement including registered applicants for employment, the equivalent of wages lost by such employees as a result of the violations, and (2.) pay into the affected Joint Trust Funds established under this Agreement any delinquent contributions to such Funds which have resulted from the violations, including such interest as may be prescribed by the Trustees or by law. Provision for this remedy herein, does not make such remedy the exclusive remedy available to the union for violation of this Section, nor does it make the same or other remedies unavailable to the Union for violations of other Sections or Articles of this Agreement.

**SECTION C.** If, as a result of violation of this Article, it is necessary for the Union and/or the Trustees of the Joint Trust Funds to institute court action to enforce an award rendered in accordance with Section B above or defend an action which seeks to vacate such an award, the Employer shall pay any accountants' and attorneys' fees incurred by the Union and/or the Fund Trustees, plus costs of the litigation which have resulted from the bringing of such action.

## ARTICLE XVIII
## TRAVELING CONTRACTORS

When the Employer has any work specified in Article VII of this Agreement to be performed outside of the area covered by this Agreement and within the area covered by an agreement with another affiliate of the International Union of Bricklayers and Allied Craftsworkers, the Employer agrees to abide by the full terms and conditions of the Agreement in effect in the job site area. Employees covered by this Agreement shall be paid at least the established minimum wage scale specified in Article IV of this Agreement but in no case less than the established minimum wage scale of the local Agreement covering the territory in which such work is being performed plus all contributions specified in the job site local Agreement. The Employer shall in all other matters be governed by the provisions established in the job site local Agreement. If employees are sent to work on a project in an area where there is no local

CT9618

-18-

Agreement covering the work specified in Article VIII of this Agreement, the full terms and conditions of this Agreement shall apply.

-19-                                    CT9618

### ARTICLE XIX                 RECEIVED JUL 2 9 1996
### DURATION

This Agreement shall remain in full force and effective from June 1, 1996 or the day after expiration of the appropriate predecessor Agreement, whichever is later, through March 31, 1999 and shall renew itself annually thereafter unless either party shall have given written notice to the other party of its desire to terminate this Agreement and negotiate a successor Agreement at least (60)sixty days prior to March 31, 1999 or any March thereafter.

IN WITNESS WHEREOF, the parties hereto have set their hands and have caused this Agreement to be executed by their duly authorized Representative on this _____ day of _____, 1996.


**EMPLOYER:**                    **INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTSWORKERS DISTRICT COUNCIL OF CONNECTICUT:**

_____

Signature                        _____
                                 Gerald Marotti, Director

_____            _____
Company Name                     Vincent Convertito, Field Representative

_____
Address

_____
City/Town   Zip Code

_____
Telephone Number

## ARTICLE XIX
## DURATION

This Agreement shall remain in full force and effective from June 1, 1996 or the day after expiration of the appropriate predecessor Agreement, whichever is later, through March 31, 1999 and shall renew itself annually thereafter unless either party shall have given written notice to the other party of its desire to terminate this Agreement and negotiate a successor Agreement at least (60)sixty days prior to March 31, 1999 or any March thereafter.

IN WITNESS WHEREOF, the parties hereto have set their hands and have caused this Agreement to be executed by their duly authorized Representative on this ‾4‾ day of ‾Aug‾, 1996.

**EMPLOYER:**

_____
Signature

Joseph Cohn e Son
Company Name

444 Chapel St
Address

New Haven CT 06511
City/Town    Zip Code

772-2420
Telephone Number

**INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTSWORKERS DISTRICT COUNCIL OF CONNECTICUT:**

_____
Gerald Marotti, Director

_____
Vincent Convertito, Field Representative

TOTAL P.01